The SUNBEAM–OSTER COMPANY, INC. GROUP BENEFITS PLAN FOR SALA-RIED AND NON–BARGAINING HOUR-LY EMPLOYEES, Plaintiff–Appellant,

v.

Leonard WHITEHURST, Jr., Defendant–Appellee.

No. 95–31269.

United States Court of Appeals, Fifth Circuit.

Dec. 19, 1996.

Mark Edward Seamster, Seale, Macaluso, Daigle & Ross, Hammond, LA, for Sunbeam–Oster Company, Inc., plaintiff-appellant.

Michael J. Mestayer, Leger & Mestayer, New Orleans, LA, for defendant-appellee.

Before KING, SMITH and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Resolution of the principal issues presented by this appeal requires the construction and application of reimbursement and subrogation provisions of the Plaintiff–Appellant Sunbeam–Oster Company, Inc. Group Benefits Plan for Salaried and Non Bargaining Hourly Employees (the Plan), a self-funded welfare benefit plan under the Employee Retirement Income Security Act of 1974 (ERISA).[1] This litigation was spawned when Defendant–Appellee Leonard Whitehurst, Jr.—a plan beneficiary who had been seriously injured in a motor vehicle accident unrelated to his employment and whose resulting six-figure medical expenses were paid by the Plan—refused to reimburse the Plan for payments it made on his behalf, even though he had recovered more than sufficient funds with which to do so from a settlement with third parties. For the reasons hereafter explained, we reverse the district court's judgment favorable to Whitehurst and hold that the plain language of the Plan was neither silent nor ambiguous but, at least by unmistakable implication, embodied a "first dollar" priority right in favor of the Plan (hereafter "Plan Priority") to be reimbursed from the proceeds of a beneficiary's recovery.

I

FACTS AND PROCEEDINGS

A. *The Accident; The Plan; Whitehurst's Lawsuit*

Whitehurst, a long-time employee of Sunbeam–Oster Company, Inc. (Sunbeam), was

---

1. 29 U.S.C. § 1001 *et seq.*

severely injured in a non-work related accident when an eighteen-wheel tractor/trailer (the rig) crossed the centerline of a rural Louisiana highway and collided with his car. Whitehurst's extreme injuries necessitated extensive surgery, hospitalization, and rehabilitation.

Whitehurst was covered by the Plan as a dependent under a family coverage arrangement in which his wife, also a Sunbeam employee, was the participant and paid the premiums. As a covered dependant he was a beneficiary of the Plan and thus was entitled to have his medical bills—totaling approximately $137,000 as of the time briefs were filed in this appeal—paid by the Plan. The Plan was a self-funded, participant-contributory, employee welfare benefits plan governed by ERISA, and provided health and medical benefits on a voluntary basis to thousands of employees of Sunbeam and their designated beneficiaries.[2] Participants were required to make contributions to the Plan, but as their total contributions were insufficient to pay the aggregate costs of covered services, claims were largely paid from the general assets of Sunbeam. Blue Cross and Blue Shield of Mississippi, Inc. (Blue Cross) served as the "third party administrator" of the Plan. In that capacity, it processed the claims of Plan participants and their beneficiaries.

After his accident, Whitehurst hired a lawyer and, together with his wife and minor child, both of whom had witnessed the critically injured Whitehurst being pried from his car at the scene of the accident, filed a state court negligence suit against the driver of the rig, its owner, and the owner's insurer. They asserted claims for Whitehurst's injuries and his wife and son's loss of consortium.[3]

The Whitehursts' attorney finally informed the Plan of this lawsuit when settlement appeared imminent, and requested itemized medical expense statements so that he might "protect [the Plan's] interests."[4] Partly in reliance on this communication from Whitehurst's counsel, the Plan chose not to intervene in the suit or participate in any settlement negotiations.

The Whitehursts ultimately settled all their tort claims arising from the accident jointly for $500,000, the limit of the rig owner's insurance policy, plus $9,000 in property damages. The settlement agreement neither apportioned the recovery among the plaintiffs nor itemized the $500,000 lump sum as to medical expenses or, for that matter, any other category of damages. In that agreement, however, the Whitehursts expressly absolved the defendants and agreed to hold them harmless from liability for "all medical expenses, hospital expenses and liens incurred by and in connection with any medical treatment rendered to [Whitehurst]."

## B. The Reimbursement Provisions of the Plan; the Plan's Lawsuit

In compliance with requirements under ERISA, Sunbeam had filed the original plan document for the Plan with the Department of Labor about two years before Whitehurst's accident. As is typically the case with ERISA self-funded welfare benefit plans, the document filed with the Department was not a formal trust indenture (here, there was none), but rather an employee benefits handbook, a "Summary Plan Description" (SPD) in ERISA parlance. As discussed more fully below, ERISA insists that the SPD be couched in ordinary conversational terms, understandable by the average reasonable employee, and not in verbose "legalese" or "insurance speak."[5] The

---

**2.** Some time after Whitehurst's accident and the Plan's payment of his medical benefits, Sunbeam–Oster replaced the Plan with another health benefits plan featuring an HMO.

**3.** In itemizing the kinds of damages they suffered, the plaintiffs' complaint expressly sought recovery of all medical costs and expenses incurred in connection with Whitehurst's injuries. Specifically, it asked for $200,000 for his past and future medical expenses.

**4.** Counsel for Whitehurst subsequently indicated to the Plan that it might only be entitled to partial reimbursement of Whitehurst's medical expenses, as Whitehurst's own recovery would likely be constrained by the policy limits of the rig owner's insurance coverage.

**5.** See infra note 20 and accompanying text.

health care benefits section of the Plan's SPD contained a number of "General Exclusions," one of which was for:

> charges for which payment or reimbursement is received by or for the individual as a result of a legal action or settlement (unless you [the participant or beneficiary] sign the necessary documents authorizing the deduction of any overpayment from your benefit, wage and pension payments).

That section of the SPD also contained a subsection titled "Subrogation," which, stated in full, provided:

> Subrogation allows the Plan to recover duplicate benefit amounts. For example, if you are injured by another individual and incur $1000 in covered expenses—and you sue that individual and recover $1000—the Sunbeam–Oster Plan does not pay benefits for those expenses. If the plan has already paid benefits, it has the right to recover payment from you. This also applies to benefits paid through the Plan's COB [Coordination of Benefit] feature.
>
> The subrogation and COB features only apply for group insurance plans (not to individually purchased coverage)—including automobile no-fault programs.

Several months prior to Whitehurst's accident, the Plan issued to plan participants (but did not file with the Department of Labor) an "Insert and Summary of Material Modification" to replace the above quoted "Subrogation" subsection. This modification, titled "Subrogation and Reimbursement Provisions," stated in pertinent part:

> The Plan has subrogation and reimbursement provisions which allow the Plan to recover for benefits it pays which are duplicated from another source. The Plan provides an automatic lien on any funds subject to reimbursement or subrogation.
>
> Reimbursement gives the Plan the right to collect from you money that you receive in a settlement or lawsuit that covers expenses that the Plan has already paid for. . . .

> Reimbursement Example—You are injured and receive $1,000 in covered expenses from the Plan. The person who caused your injury agrees to settle with you and pays you the $1,000. The Sunbeam–Oster Plan has a legal right to reimbursement from you of the $1,000.

This provision essentially reiterates the general reimbursement right described in the original SPD's "Subrogation" section but expands it by removing the previous version's limitation on the Plan's right to subrogation and reimbursement from the proceeds recovered by the participant or beneficiary from individually purchased insurance coverage—a matter not at issue here.

Two or three months after the accident but before any medical bills had been paid, Blue Cross sent Whitehurst a standard form that inquired about, inter alia, the possibility of recovering the Plan's medical expenses from a third party tortfeasor.[6] Whitehurst completed most sections of the form, signed it, and returned it to Blue Cross; however, he left unsigned the reimbursement/subrogation section of the form. That section provided:

> I request that payment of benefits be advanced and in consideration of such payment I agree that should any recovery be obtained by me from the responsible person(s) or from his insurer(s), I will reimburse Blue Cross & Blue Shield of Mississippi, Inc., the total amount of benefits provided by it up to the amount of my recovery.

The next month, while Whitehurst was convalescing at home and undergoing outpatient treatment at a rehabilitation facility, Blue Cross wrote to him, enclosed another copy of the same form, and advised him that his failure to sign and return the reimbursement/subrogation portion of the form would be interpreted by Blue Cross as signifying that his medical bills would be paid by or from some other source. About a week after Whitehurst received this second copy of the form—and without comment, question, or objection—he signed the reimbursement/subro-

---

**6.** This form appears to have been one of the "documents" that the General Exclusions section of the SPD required plan participants to sign if they were to avoid the exclusion for "charges for which payment or reimbursement is received by or for the individual as a result of a legal action or settlement."

gation section and returned the form to Blue Cross. A short while later the Plan began paying his medical bills.

The particular Blue Cross form, copies of which Whitehurst signed, had not been specifically tailored for use with the plan. Rather it was a generic document then being used widely and routinely by Blue Cross for many plans that it served in the same or similar administrative capacities.

The Plan's amicable efforts to obtain reimbursement from the Whitehursts after they had settled their lawsuit proved fruitless, so suit was filed against Leonard Whitehurst individually seeking (1) reimbursement of the medical benefits that the Plan had paid on his behalf, (2) a credit or offset for future medical expenses that Whitehurst. was projected to incur, up to the full amount of his settlement, and (3) interest and reasonable attorneys' fees. Whitehurst answered and filed counterclaims against the Plan, alleging that it had breached its fiduciary duty to him by failing to (a) treat his claim consistently with other claims, (b) pay his ongoing medical claims, and (c) furnish him a copy of the Plan description. In conjunction with these counterclaims, Whitehurst sought penalties, damages, interest, and attorneys' fees.[7]

Following completion of a two day bench trial, the district court entered a judgment in favor of Whitehurst, dismissing the Plan's complaint and Whitehurst's counterclaim. In its Reasons for Judgment, the court found that the Plan's plain language was silent as to the Plan's rights of reimbursement and subrogation in the case of a beneficiary who only partially recovers his damages from a third party. That silence, the court concluded, called for a determination of the intent of the parties. Rejecting the probative value of evidence adduced by the Plan to establish that the intent of the parties was for the Plan to be entitled to a Plan Priority reimbursement right to any funds recovered by a beneficiary, the court determined that the parties had not formed an intent on the issue. The court next observed that this circuit had not yet announced a rule of interpretation to apply to subrogation and reimbursement

rights of ERISA plans in the absence of any discernible intent regarding the nature, extent, or sequence of such rights—either from the plain language of the Plan or the objectively determined intent of the parties as manifested by extrinsic evidence. The court therefore adopted, as a matter of federal common law, the Make Whole principle of subrogation and reimbursement as a default rule of construction. Under the Make Whole rule, a plan is not entitled to recoup anything by way of subrogation or reimbursement until the beneficiary has been made entirely whole through recovery of all compensatory damages to which he is entitled. In essence, the Make Whole rule is the diametric opposite of the Plan Priority rule: In the former, a plan gets no reimbursement until the beneficiary has been made whole; in the latter, the beneficiary retains nothing until he has reimbursed the plan (or the plan has recovered through subrogation) all funds expended on medical costs of the beneficiary, dollar for dollar.

Finally, after adopting the Make Whole rule, the court found that Whitehurst had suffered damages of $2 million, and that his wife and child together had suffered an additional $500,000 in damages. It therefore ruled that the Plan had no right to reimbursement because Whitehurst had not been made whole by the settlement. The court also rejected both parties' claims for costs and attorneys' fees.

The Plan timely filed a Notice of Appeal, but Whitehurst did not appeal the district court's dismissal of his counterclaims. The Plan's principal contentions on appeal are that the district court erred in (1) finding the plain language of the Plan to be silent or ambiguous with respect to reimbursement rights and, alternatively, in disregarding evidence offered by the Plan with respect to the intent of the parties regarding those rights, (2) adopting the Make Whole principle as a default rule of construction with respect to the Plan and all other similarly situated plans, (3) attempting to quantify Whitehurst's damages, and (4) not awarding attor-

---

7. Defendant Whitehurst also filed an Offer of Judgment pursuant to Fed.R.Civ.P. 68 proposing to allow the Plan to enter a judgment of $55,000 plus costs.

neys' fees to the Plan in accordance with 29 U.S.C. § 1132.

## II

## ANALYSIS

### A. Standard of Review

In *Firestone Tire and Rubber Co. v. Bruch* [8] the Supreme Court established the rule that courts must apply a *de novo* standard of review in actions brought by ERISA plan participants to challenge the denial of benefits *unless* the plan vests the plan administrator with discretionary authority to make eligibility determinations or construe the plan's terms. When the plan so endows its administrator, the decision of the administrator must stand unless there is an abuse of discretion.[9] It is only in those cases involving plans that have not vested their administrators with such authority that the court must follow traditional principles of trust law and construe a participant's claim "as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent." [10]

■ Federal courts have consistently applied *Firestone*'s deference principles to actions concerning benefit determinations brought not only by participants but also by ERISA plans and, in particular, claims involving ERISA plans' assertions of purported reimbursement and subrogation rights.[11] In this case, the parties agree that the version of the Plan in effect at the time of Whitehurst's injuries did not give the Plan administrator discretionary authority to interpret the Plan. Thus, the district court properly withheld deference and applied a *de novo* standard of review.

■ In turn, our consideration of the district court's rulings regarding the Plan's reimbursement rights must be conducted under the usual standards of review that we apply in non-jury civil cases: [12] Questions of law, such as a court's interpretation of an ERISA plan when the plan's terms are clear and there is no grant of interpretive authority to a plan administrator—or even the preliminary determination whether an ERISA plan's language is silent or ambiguous—are reviewed *de novo*; [13] findings of fact, such as the intent of the parties regarding an ERISA plan, are reviewed for clear error.[14] Although a district court's weighing of the evidence is entitled to considerable deference, a factual finding may be "clearly erroneous" when we are "left with a definite and firm conviction that a mistake has been made." [15]

### B. Interpretation of the Plan

#### 1. The Language of the Plan

■ The fundamental predicate of the district court's judgment in this case lay in its holding that the language of the Plan's SPD—in this instance, the governing document of the Plan—was silent in regard to priority of reimbursement. The court found silence not on the Plan's entitlement to reimbursement vel non once a beneficiary obtains a judgment or settlement of partial recovery from a third party or his insurer, but only on the question of what law rule establishes the ranking or priority between the Plan and the beneficiary in a partial recovery situation; i.e., (1) *Plan Priority,* under which priority

---

8. 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

9. *Id.; see also Cutting v. Jerome Foods, Inc.,* 993 F.2d 1293, 1295–96 (7th Cir.) *cert. denied,* 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993).

10. *Firestone,* 489 U.S. at 112–13, 109 S.Ct. at 955–56.

11. *See Cutting,* 993 F.2d at 1295–96; *Baxter By and Through Baxter v. Lynn,* 886 F.2d 182, 187 (8th Cir.1989); *Sanders v. Scheideler,* 816 F.Supp. 1338, 1342 (W.D.Wis.1993), *aff'd,* 25 F.3d 1053 (7th Cir.1994); *Trustees of Hotel Employees and Restaurant Employees Int'l Union*

*Welfare Fund v. Kirby,* 890 F.Supp. 939, 942 (D.Nev.1995).

12. *Switzer v. Wal–Mart Stores, Inc.,* 52 F.3d 1294, 1298 (5th Cir.1995).

13. *Id.; Liberty Mutual Ins. Co. v. Pine Bluff Sand & Gravel Co., Inc.,* 89 F.3d 243, 246 (5th Cir. 1996).

14. *Switzer,* 52 F.3d at 1298.

15. *Id.* (citing *Anderson v. City of Bessemer City,* 470 U.S. 564 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

is given to the plan for full recovery "off the top," (2) *Make Whole,* under which priority is given to the beneficiary to keep everything he recovers from third parties until he is made entirely whole, or (3) *Pro Rata,* under which the plan and the beneficiary share ratably in the beneficiary's recovery from third parties. The district court examined the plain language of the "Subrogation" section of the SPD, as well as the subsequent "Material Modification" which replaced it, and found in particular that the former's reference to "*duplicate* benefit amounts" and the latter's statement that the Plan is entitled to recover "benefits it pays which are *duplicated* from another source," merely preclude the participant from receiving a "windfall" or "double recovery" and do not establish the priority of recovery in reimbursement between the Plan and a beneficiary.

With all due respect to the district court, we must disagree with its foundational premise with respect to this issue, i.e., that the plain language of the SPD's subrogation and reimbursement provisions is either wholly silent or ambiguous. At the outset, we emphasize that the Plan's reimbursement and subrogation provisions must be read in the statutory context of ERISA and, more particularly, in the precise textual context in which they appeared. In keeping with this observation, we remain keenly aware that subrogation and reimbursement provisions in ordinary commercial insurance policies and workers' compensation laws are far from analogous, and are at best instructive, when considering ERISA plans established solely

in summary plan descriptions. Were this a diversity case involving reimbursement or subrogation in the context of either workers' compensation or individual or group insurance plans that are *not* ERISA plans, we would, of course, be *Erie*-bound to apply Louisiana's partial subrogation doctrine, which embodies the Make Whole principle.[16] Yet, as it is well established that state subrogation doctrines are preempted under ERISA,[17] we are not *Erie*-bound to apply Louisiana's partial subrogation rules here. Thus, even though we may borrow from analogous state law when it is not inconsistent with congressional policy concerns, our formulation of federal common law in the instant situation must remain guided foremost by the congressional policies expressed or implicit in ERISA.[18]

With these observations firmly in mind, we reiterate that the subrogation and reimbursement provisions at issue in this case were not part of a standard individual insurance contract purchased by or for the employee in the insurance market. If they had been, they would surely have been drafted with more particularity and with a plethora of legalistic boilerplate; and we would be subjecting them to a stricter standard of interpretation as well.[19] Instead, though, the particular provisions that here created the Plan's reimbursement right appeared in the SPD, a document that is expressly required by ERISA to be "written in a manner calculated to be understood by the average plan participant," and need only be "sufficiently accurate and comprehensive to reasonably

---

**16.** *See* La. Civ.Code art. 1826; *Southern Farm Bureau Cas. Ins. v. Sonnier,* 406 So.2d 178, 180–81 (La.1981) (deriving make whole policy from Civil Code sources); *Smith v. Manville Forest Products Corp.,* 521 So.2d 772, 775 (La.Ct.App. 2nd Cir.), *writ denied,* 522 So.2d 570 (La.1988) (holding that Louisiana's make-whole policy of partial subrogation is equally applicable to reimbursement provision of health care plan).

**17.** *FMC Corp. v. Holliday,* 498 U.S. 52, 65, 111 S.Ct. 403, 411, 112 L.Ed.2d 356 (1990); *Barnes v. Ind. Auto. Dealers Ass'n of California Health and Welfare Benefit Plan,* 64 F.3d 1389, 1392 (9th Cir.1995).

**18.** *Jones v. Georgia Pacific Corp.,* 90 F.3d 114, 116 (5th Cir.1996) (citing *Brandon v. Travelers*

*Ins. Co.,* 18 F.3d 1321, 1325 (5th Cir.1994), and *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1451 (5th Cir.1995)).

**19.** A number of state court cases involving non-ERISA insurance policies have limited their recognition of an insurer's right of first priority over the insured's third party recovery to instances in which the policy contained an express, and especially detailed, reservation of such rights. *See e.g., Higginbotham v. Arkansas Blue Cross & Blue Shield,* 312 Ark. 199, 849 S.W.2d 464, 466 (1993); *Foremost Life Ins. Co. v. Waters,* 415 Mich. 303, 329 N.W.2d 688, 689 (1982); *Peterson v. Ohio Farmers Ins. Co.,* 175 Ohio St. 34, 191 N.E.2d 157, 159 (1963); *and see generally* Robert E. Keeton & Alan I. Widiss, *Insurance Law* § 3.10(b), at 234–36 (1988).

apprise such participants and beneficiaries of their rights and obligations under the plan." [20]

Furthermore, as there was no separate master document or trust agreement in this instance, the SPD and modifications to it are the only writings that address basic questions of benefit eligibility and participant or beneficiary obligations under the Plan. Significantly, this kind of plan documentation is far from unusual; an SPD is frequently the only governing document created for and filed with the Department of Labor when the plan is a self-funded employee welfare benefit plan like the one we consider today. This is not surprising when it is recognized that the SPD is the only document that, under ERISA, is subject to mandatory filing with the Department of Labor and mandatory distribution to participants and beneficiaries.[21]

In light of these congressional imperatives and common industry practices, we should not (and will not) penalize the Plan, or other similar ERISA plans for that matter, for lack of technical precision or verbosity by labeling the Plan "silent" or "ambiguous" when it uses the kind of direct, jargon-free language that is mandated by ERISA for all summary plan descriptions and does not expressly address every conceivable factual variation of recovery, depending on which combination of source and fraction is under consideration at the time. In other words, the fact that the SPD for the Plan does not express a reimbursement priority for each possible combination or permutation—here, the beneficiary's partial recovery from the tortfeasor's insurer—is not a valid reason for branding the SPD as silent and subjecting it first to a search for the intent of the parties and then to a default rule of interpretation if their intent cannot be discerned.

In this case, the original subrogation subsection of the SPD stated plainly that "[s]ubrogation allows the Plan to recover duplicate benefit amounts . . . .," and added by way of explanation that, "[i]f the plan has already paid benefits, it has the right to recover payment from you." The Material Modification reiterated these straightforward concepts in language that is, as required by ERISA, just as unmistakably plain, clear, and understandable by the average reasonable employee:

> The Plan has subrogation and reimbursement provisions which allow the Plan to recover for benefits it pays which are duplicated from another source. . . . Reimbursement gives the Plan the right to collect from you money that you receive in a settlement or lawsuit that covers expenses that the Plan has already paid for. . . .

Thus, regardless of which version of the Plan is controlling,[22] the central thrust of the Plan's reimbursement rights was made amply clear: The Plan is entitled to obtain reimbursement for "duplicate benefit amounts" or "benefits duplicated from another source."

When this language is read in context and viewed in light of all the circumstances, it can only mean that the Plan is entitled to be paid back by the beneficiary all amounts that the Plan has paid to the beneficiary, or on his behalf, to the full extent—but only to the extent—that the beneficiary recovers from another source (such as insurance purchased

---

**20.** 29 U.S.C. § 1022(a)(1). *See also Jones v. Georgia Pacific Corp.,* 90 F.3d 114, 116 (5th Cir.1996) (quoting *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1452 n. 1 (5th Cir.1995)(although courts must construe plan terms strictly in favor of the insured when plan terms remain ambiguous after applying ordinary principles of contract interpretation, we must interpret ERISA plans themselves "in an ordinary and popular sense as would a person of average intelligence and experience")); *Brewer v. Lincoln Nat'l Life Ins. Co.,* 921 F.2d 150, 154 (8th Cir.1990), *cert. denied,* 501 U.S. 1238, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991) (In fashioning federal common law for the construction of undefined terms in ERISA, court cited § 1022(a)(1) as indication that "[i]t would

be improper and unfair to allow experts to define terms that were specifically written for and targeted toward lay persons. . . . [Hence] the terms should be accorded their ordinary, and not specialized, meanings.").

**21.** 29 U.S.C. § 1021(a) & (b).

**22.** Given their similarity, the district court noted that the outcome of the case did not depend on which version of the Plan's subrogation and reimbursement provisions are given effect. With this we agree, although possibly for different reasons.

individually, a tortfeasor, the insurer of a tortfeasor, or the like). Far from the kind of silence that would be tantamount to ambiguity, the only silence here is the understandable absence of separate, specifically articulated rules for situations of partial recovery and total recovery with variations depending on the nature of the source of recovery. This signifies nothing more than that, regardless of source, the rule is the same for total and partial recoveries. Again, the absence of more particularized and technical legal language addressing the partial recovery situation cannot be grounds for supplanting the Plan Priority rule when recovery is partial, and thereby penalizing the Whitehursts' fellow employees.[23] This is doubly so when ERISA dictates that summary plan descriptions be simple and understandable by employees of varying backgrounds, and when the governing subrogation and reimbursement provisions express a reasonable and, indeed, the generally understood, meaning of these concepts.[24]

That judges and lawyers, who by education and experience are primed to discover ambiguity in contract language, might find gaps or contradictions in a summary plan description's ordinary, conversational language does not mean that the language is necessarily ambiguous or silent to the point of default for ERISA purposes.[25] Whatever might or might not be appropriate in cases involving workers' compensation or individual or group medical insurance policies,[26] no such jurisprudential gloss can be justified in the context of a self-funded ERISA welfare benefit plan.

In sum, we hold that the plain language of the Plan's subrogation and reimbursement provisions was clear and unambiguous, and that—in the absence of any expressly selected alternative standard (such as Pro–Rata or Make Whole) which deviates from the anticipated Plan Priority norm—such language vested the Plan with an unconditional and unequivocal Plan Priority right to reimbursement for the full amount of the medical benefits it paid on a participant's behalf, from any and all funds that a participant might recover from, inter alia, a third party tortfeasor or his insurer. This holding is bolstered by the recognition that there is nothing included in or omitted from the Plan's plain language on which to base a conclusion that the Plan's unqualified and unequivocal right to reimbursement should be displaced by Pro Rata or Make Whole concepts.

### 2. *The Parties' Intent; The Make Whole Rule*

Having determined that the plain language of the pertinent portions of the SPD is clear and unequivocal—and thus neither silent nor ambiguous—and that such language vests the Plan with the right to recover in reimbursement from Whitehurst all amounts that the Plan has spent and will spend in provid-

---

**23.** As Judge Posner observed in *Cutting*, rejection of the Make Whole principle in favor of unequivocal subrogation or reimbursement rights has the effect of reducing the price of insurance for insureds (here the participants and their beneficiaries) and enabling the insureds to obtain more coverage, "in effect trading an uncertain bundle of tort rights for a larger certain right, which is just the sort of trade that people seek through insurance." 993 F.2d at 1298.

**24.** "Recognition and enforcement of a right of subrogation for health insurers is *primarily premised on precluding duplicative recoveries*." Keeton & Widiss, *supra* n. 16, § 3.10(a)(7), at 231 (emphasis added).

**25.** We are aware that a few district courts, in confronting ERISA plan language they found to be silent or ambiguous regarding the nature or extent of a plan's subrogation or reimbursement rights in instances of a participant's partial third party recovery, have chosen, just as the district court did here, to adopt the Make Whole princi-

ple as the federal common law default rule of interpretation. See notably *Sanders v. Scheideler,* 816 F.Supp. 1338 (W.D.Wis.1993), *aff'd,* 25 F.3d 1053 (7th Cir.1994); *Murzyn v. Amoco Corp.,* 925 F.Supp. 594 (N.D.Ind.1995). Although we acknowledge these courts' honest efforts to solve a difficult jurisprudential problem, we neither adopt their reasoning as the rule of this circuit nor write around them. We simply disagree.

**26.** For a discussion outlining these competing common law approaches to allocation of an insured's recovery from third parties vis-a-vis the insured and an insurer with a subrogated interest, see Keeton & Widiss, *supra* n. 16, § 3.10(b), at 233–40. Especially noteworthy is Keeton and Widiss's conclusion that "[t]he arguments for preferring one over another of the rules of allocation are rather inconclusive in principle, and they are unsettled in the precedents." *Id.* at 240.

ing covered benefits to Whitehurst, up to the full amount of his recovery from the instant tortfeasor and that tortfeasor's insurer, we do not reach the issues of the parties' intent or the appropriate default rule to be supplied by this circuit when the need occurs. It is axiomatic that we shall search for the intent of the parties only when the plain language under consideration is either ambiguous or silent, and we shall supply a default rule only when the necessary rule has not been supplied by the plan, the law, or the parties through their agreements.

Nevertheless, for us to arrive at the point in our review at which we could find the Plan's plain language sufficient unto the day, we had to consider with care the entirety of the district court's opinion and the law and evidence on which the opinion and judgment of that court are based. When we did so, we were left with the distinct impression that, were we to reach and consider those questions which we do not reach today, we would have serious misgivings about the district court's answers to them. In this regard we harbor some lingering concerns that if we were to stop at this point without adverting to the parties' intent or the default rule our readership might wrongly interpret today's opinion as merely reversing the district court "on other grounds," and by doing so misconstrue our failure directly to refute that court's pronouncements regarding intent of the parties and the appropriate default rule. As that is not the case, we close this portion of our opinion with a few brief observations concerning those points, so as to dispel any erroneous inferences that our readers might thus make.

First, had it been necessary for us to consider the question of the intent of the parties, we are not at all convinced that we would have agreed with the district court's conclusion that no intent is discernible regarding priority of reimbursement. On the contrary, we speculate that the intrinsic evidence in the record of this case may well have convinced us that the parties' intent was manifested, and that as manifested it embraced the Plan Priority rule of reimbursement. Still, we readily acknowledge that the exercise of determining objective intent of

the parties in an ERISA case such as the one now before us, wherein the plan sponsor initially confects the plan documents unilaterally and thereafter each potential participant must either "take it or leave it" in toto, truly begs the question of bilateral intent in the usual contractual context, albeit that is the standard we must and do apply.

We are equally chary about ascribing the label "economic duress" to the activities of Blue Cross surrounding Whitehurst's execution of the reimbursement and subrogation portion of the standard Blue Cross acknowledgment form. Had it been necessary for us to review this issue in conjunction with the freedom of the will with which Whitehurst formed his intent, we might well have concluded that the district court clearly erred in finding (1) lack of consideration, (2) lack of understanding by Whitehurst as to the meaning of the Blue Cross form, and (3) presence of current economic pressure sufficient to constitute economic duress. We cannot ignore, for example, that Whitehurst testified that he understood the import of the form but implied that he simply did not like the result. Moreover, the district court's statement to the contrary notwithstanding, the evidence demonstrates that Whitehurst was not languishing in the hospital, physically incapacitated and highly medicated, at the time he signed the form; rather, that he was recuperating at his home and participating as an out-patient at a rehabilitation center about an hour's drive from that home. And, lastly, the record is devoid of any probative evidence that Whitehurst was under financial pressure from his medical creditors either to pay his bills or risk surcease of services. Indeed, Whitehurst's first four medical bills had already been paid by the time he signed the form, and the remaining bills were not even forwarded to Blue Cross until some time after he had signed that form. Absent such current economic pressure there could be no economic duress.

But the portion of the district court's opinion and holding that gives us the most serious concern is that court's admittedly res nova selection of the Make Whole rule as the appropriate default rule of construction for interpreting an ERISA plan's reimbursement and subrogation rights when and if: (1) the

participant or beneficiary's recovery from other sources is partial only, (2) the plan is silent or ambiguous, (3) the plan administrator is not vested with discretionary authority to interpret the plan, and (4) the intent of the parties cannot otherwise be determined. Regardless of whether the Make Whole rule might be applicable in situations involving private insurance policies or Workers' Compensation, and irrespective of what we might be *Erie*-bound to hold were this a diversity case and not a federal question ERISA case, we have serious doubts whether we would ever approve or adopt the Make Whole rule as this circuit's default rule for the priority of recovery in reimbursement or subrogation between an ERISA plan and its participant or beneficiary under circumstances such as the ones we consider today.

To reiterate, we do not reach the questions of the intent of the parties or the appropriate default rule for reimbursement or subrogation because we find the plain language of the Plan to be unambiguous in endowing the Plan with the priority right to be reimbursed, dollar for dollar, for all benefits provided to a participant or beneficiary, to the full extent that the participant or beneficiary recovers from, inter alia, a tortfeasor or his insurer or both. Nevertheless, we emphasize that our reversal vacates in toto the district court's judgment and opinion, including, without limitation, its adoption of the Make Whole rule for purposes of construing reimbursement and subrogation rights under ERISA plans. That question remains open, presumably to be decided on another day, in another appeal, by another panel of this court.

## C. Attorneys' Fees; Extent of Damages

### 1. Attorneys' fees

■■ Both parties to this appeal sought attorneys' fees in the district court pursuant

to 29 U.S.C. § 1132, and both saw their claims rejected by that court. On appeal, however, only the Plan seeks review of this aspect of the district court ruling. As a general rule, the decision to award attorneys' fees is left to the sound discretion of the trial court and will be reversed only for an abuse of discretion.[27] We find no abuse of discretion by the district court here, even though on appeal we have altered the outcome of the case rather dramatically.

■ The five factors to be considered in determining whether to award attorneys' fees pursuant to section 1132(g)(1) may now have a slightly difference valence,[28] yet they still augur for sustaining the district court's refusal to award attorneys' fees to the Plan. Most significantly, for purposes of this case we find essentially no evidence of culpability or bad faith on Whitehurst's part,[29] and conclude that, given the district court's ruling in Whitehurst's favor, the relative merits of the parties' positions were not overwhelmingly stacked on the Plan's side. It follows that the district court's denial of the Plan's request for attorneys' fees was neither arbitrary nor capricious, and is therefore affirmed.

### 2. Extent of Whitehurst's Damages

As the final point of our analysis, we observe that on appeal the Plan also challenged the district court's additional findings—apparently articulated by that court just in case we were to determine that the Pro Rata division of Whitehurst's recovery would be appropriate—regarding the total amount of damages suffered by Whitehurst and the percentage of those damages attributable to

---

**27.** *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1458 (5th Cir.1995).

**28.** Those factors are: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a

significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position. *Todd*, 47 F.3d at 1458.

**29.** The only hint of bad faith we detected came from Whitehurst's counsel's arguably duplicitous letter requesting information from the Plan to protect the Plan's interests. The district court did not find this letter sufficiently misleading to warrant penalizing Whitehurst with an assessment of attorney's fees, and we defer to its discretion on that point.

medical expenses. As we reverse the district court's judgment in favor of Whitehurst and render judgment in favor of the Plan, recognizing its right to full, dollar-for-dollar reimbursement "off the top" of Whitehurst's recoveries from his tortfeasor and the tortfeasor's insurer, we need not and therefore do not reach the question whether the district court erred in making additional findings on the extent of Whitehurst's total damages. The matter is now moot.

## III

## CONCLUSION

We find inescapable the conclusion that our most able and conscientious colleague on the district bench erred reversibly in determining that the wording of the subrogation and reimbursement provisions of the instant SPD does not import, at least by strong and reasonable implication, the standard for determining the reimbursement priority between the Plan and the beneficiary. We conclude that, when read in context, the relevant language contemplates application of a rule for reimbursement, and that the rule thus contemplated is the Plan Priority rule. As such, we do not reach the issues of the intent of the parties or the appropriate rule of default to supply if the Plan were silent or ambiguous regarding the priority of reimbursement and the intent of the parties in that regard were not otherwise discernible. Were it necessary to determine the appropriate rule of default to supply under the circumstances presented by this case, however, we have little doubt that the Make Whole rule would not be the one we would supply.

For the foregoing reasons, therefore, we reverse the judgment of the district court to the extent that it denied the Plan's right to full reimbursement from the settlement funds paid to Whitehurst by his tortfeasor and the insurer of his tortfeasor; and we remand this case to that court for entry of an appropriate judgment directing Whitehurst to reimburse the Plan, dollar for dollar, for all qualifying expenditures made on his behalf, as well as for all expenditures of such nature that the Plan might make in the future, up to the full amount of Whitehurst's

recoveries from his tortfeasor and the insurer of his tortfeasor. We affirm the judgment of the district court, however, to the extent it denied the requests of the Plan to be awarded attorneys' fees and costs under the provisions of 29 U.S.C. § 1132.

REVERSED and REMANDED in part; AFFIRMED in part.