**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

JOSEPH E. ALVES AND
KRISTI ALVES,

        Plaintiffs-Appellants,

v.

SILVERADO FOODS, INC. AND
SILVERADO FOODS WELFARE
BENEFIT PLAN,

        Defendants-Appellees.

No. 00-5011
(D.C. No. 99-CV-48-K)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **SEYMOUR**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**BELOT**, District Judge.[**]

_____

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] Monti L. Belot, United States District Judge for the District of Kansas, sitting by designation.

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f). The case is therefore submitted without oral argument.

## INTRODUCTION

Joseph and Kristi Alves appeal the district court's final order and judgment granting in part and denying in part their motion for summary judgment  The Alves filed this ERISA enforcement action seeking declaratory and injunctive relief after their employee welfare benefit plan refused to pay medical benefits. On cross-motions for summary judgment, the district court found the plan's refusal justified due to the Alves' refusal to sign a reimbursement acknowledgment form. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

Through his employer, Silverado Foods, Inc., Joseph Alves participated in the Silverado Foods Welfare Benefit Plan ("the Plan"), an "employee welfare benefit plan" governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et. seq. ("ERISA"). Alves' wife and minor son, Kristi and Braden Alves, were beneficiaries of the Plan and were thus "covered persons" under the terms of the Plan. Silverado Foods, Inc. is the Named Fiduciary of the

Plan.

Pursuant to 29 U.S.C. § 1021(a), the Plan distributed a Summary Plan Description ("SPD") to its plan participants and beneficiaries.[1]   Importantly, for purposes of this litigation, the SPD provided for the Plan's subrogation rights in instances of third-party recovery situations.  The SPD stated:

**RIGHT OF SUBROGATION AND REFUND**

**When this provision applies.**  The Covered Person may incur medical or dental charges due to injuries which may be caused by the act or omission of a third party.  In such circumstances, the Covered Person may have a claim against that third party, or insurer, for payment of the medical or dental charges.  Accepting benefits under this Plan for those incurred medical or dental expenses automatically assigns to the Plan any rights the Covered Person may have to recover payments from any third party or insurer.  This subrogation right allows the Plan to pursue any claim which the Covered Person has against any third party, or insurer, whether or not the Covered Person chooses to pursue that claim.  The Plan may make a claim directly against the third party or insurer, but in any event, the Plan has a lien on any amount recovered by the Covered Person whether or not designated as payment for medical expenses.  This lien shall remain in effect until the Plan is repaid in full.

The Covered Person:

- automatically assigns to the Plan his or her rights against any third party or insurer when this provision applies; and

---

[1] ERISA requires an SPD to be "written in a manner calculated to be understood by the average plan participant, and  . . . be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  29 U.S.C. § 1022(a)(1); see also 29 C.F.R. § 2520.102-2(a) and (b).

- must repay to the Plan the benefits paid on his or her behalf out of the recovery made from the third party or insurer.

**Amount subject to subrogation or refund.** The Covered Person agrees to recognize the Plan's right to subrogation and reimbursement. These rights provide the Plan with a priority over **any** funds paid by a third party to a Covered Person relative to the Injury or Sickness, including a priority over any claim for non-medical or dental charges, attorney fees, or other costs and expenses. Notwithstanding its priority to funds, the Plan's subrogation and refund rights, as well as the rights assigned to it, are limited to the extent to which the Plan has made, or will make, payments for medical or dental charges as well as any costs and fees associated with the enforcement of its rights under the Plan.

When a right or recovery exists, the Covered Person will execute and deliver all required instruments and papers as well as doing whatever else is needed to secure the Plan's right of subrogation as a condition to having the Plan make payments. In addition, the Covered Person will do nothing to prejudice the right of the Plan to subrogate.

**Defined terms:** "Recovery" means monies paid to the Covered Person by way of judgment, settlement, or otherwise to compensate for all losses caused by the Injuries or Sickness whether or not said losses reflect medical or dental charges covered by the Plan.

"Subrogation" means the Plan's right to pursue the Covered Person's claims for medical or dental charges against the other person.

"Refund" means repayment to the Plan for medical or dental benefits that it has paid toward care and treatment of the Injury or Sickness.

(Summary Plan Description at 34; Aplt. App., Tab 7 at 000194).

On March 3, 1997, Kristi and Braden Alves were involved in a catastrophic motor vehicle accident in which Kristi Alves suffered a permanent and irreversible brain injury. As a result of the injuries sustained from the accident,

the Alves incurred medical expenses totaling $ 103,514.24.  The Alves filed suit

in Texas against the tortfeasor who tendered the limits of an available liability

policy in the amount of $ 100,000.  The Texas state court action has not been

resolved, nor have the Alves accepted the $ 100,000 tendered.

The Alves submitted their medical bills to the Plan for processing and

payment.  The Plan, however, required the Alves to sign a standard

reimbursement acknowledgment form before it would pay out any benefits.  The

acknowledgment form read:

> In accordance with the Subrogation provision of the SILVERADO
> FOODS Employee Health Benefit Plan, the undersigned hereby
> agrees to reimburse and pay promptly to the SILVERADO FOODS
> Employee Health Benefit Plan an amount not exceeding the
> aggregate amount of benefits paid or to be paid to me or on my
> behalf under said Plan for charges incurred as a result of injury
> sustained or disease contracted on or about _____ in
> _____ County, State of _____ out of recovery by
> settlement or judgment or otherwise, from any person's or
> organization's insurance.
>
> The undersigned agrees to execute instruments and papers, furnish
> information and assistance, and to take other necessary and related
> actions that SILVERADO FOODS may require to facilitate its right
> of reimbursement under the Employee Health Benefit Plan.
>
> The undersigned represents and warrants that no release or discharge
> has been given with respect to his (their) rights of recovery described
> herein and that the undersigned has done nothing to prejudice said
> rights.

The Alves refused to sign the acknowledgment form, believing the form granted

the Plan additional rights and that their signing the form would waive their legal

rights.

The Plan then offered the Alves a second "supplemental" reimbursement acknowledgment form as an alternative to the first acknowledgment form. As with the first reimbursement acknowledgment form and for the same reasons, the Alves refused to sign the supplemental acknowledgment form. Because the Alves refused to sign either of the reimbursement acknowledgment forms, the Plan refused to pay their claims for medical expenses.

The Alves filed this ERISA action against the Plan seeking declaratory and injunctive relief. The Alves asked the district court to require the Plan to process and pay the benefits due under the terms of the plan. The Alves also asked the district court to clarify the impact of the subrogation language contained in the plan. The Alves further sought damages for the Plan's breach of its fiduciary duties. The Plan responded with a counterclaim for declaratory relief. The Plan asked the district court to determine that not only did it have the right to refuse to pay the Alves' medical bills until after the Alves signed the reimbursement acknowledgment form, but that it would also have a priority over any recoveries the Alves would receive from third parties as reimbursement for its payment of the Alves' medical bills.

In their motion for summary judgment, the Alves contended the Plan would not have a priority over the expected settlement with the tortfeasor's insurer

because, as their actual medical expenses exceeded the expected recovery, they would not be made whole. The Alves further alleged the Plan breached its fiduciary duties to them in three ways: by refusing to process and pay the claims, by proposing the supplemental reimbursement agreements, and by attempting to hire the Alves' attorney to represent the Plan's interests in the case against the third-party tortfeasor. The Plan also moved for summary judgment, arguing the subrogation clause was not void as a matter of law, the SPD specifically provides the Plan with the right to require a reimbursement acknowledgment form prior to its paying benefits, and that the Alves' refusal to sign such forms breached their duty under the terms of the SPD, justifying the Plan's refusal to pay medical benefits.

## THE DISTRICT COURT OPINION

After concluding that an "arbitrary and capricious" standard of review was applicable, the district court first determined the Plan's subrogation rights would not vest until after the plan paid benefits. Because the Plan had, as of the time of the opinion, failed to pay benefits, the Plan had no subrogation rights. However, the real question, the district court determined, was whether the Plan could require a signed subrogation form before paying benefits. The district court answered that it was reasonable for the Plan to require a signed document securing the Plan's right of subrogation (even before that right of subrogation

exists) prior to paying benefits.

The district court determined it was reasonable for the Plan to require the Alves to sign the first offered subrogation form because the form was a reasonable restatement of the SPD's subrogation provision. The district court found the second offered subrogation form to contain several misrepresentations and unreasonable interpretations of the plan. After noting that the Plan only required plaintiffs to sign *one* of the subrogation forms, the court found it not arbitrary and capricious to require signing of the first, but that it was arbitrary and capricious to require a signing of the second.

Next, the district court discussed the application of the Make Whole doctrine. After discussing the circuit split and the Tenth Circuit's lack of opportunity thus far to decide the issue, the district court found it did not need to determine whether ERISA plans are subject to the Make Whole doctrine because the Plan's subrogation provision was an explicit contractual rejection of the doctrine. The district court quoted the SPD as stating that the Plan's subrogation and reimbursement rights

> provide the Plan with a **priority** over any funds paid by a third party to a Covered Person relative to the Injury or Sickness, including a **priority** over any claim for non-medical or dental charges, attorney fees, or other costs and expenses. Notwithstanding its **priority** to funds, the Plan's subrogation and refund rights . . . are limited to the extent to which the Plan has made, or will make, payments for medical or dental charges as well as any costs and fees associated with the enforcement of its rights under the Plan.

Dist. Ct. Op. at 13 (quoting Summary Plan Description at 34) (emphasis added). To this the district court explained that the provision "explicitly adopt[ed] the Plan Priority rule, the opposite of [M]ake [W]hole, whereby the Plan must be completely reimbursed before [the Alves] can keep any of the money recovered from the third-party tortfeasor." Dist. Ct. Op. at 13.

As for the Alves' claims that the Plan breached its fiduciary duty, the district court first determined the plan did not as to its (1) refusal to pay benefits; and (2) requiring the signing of the first subrogation agreement before paying benefits because the court had previously determined neither action was based on an unreasonable reading the plan. The district court found the Plan properly interpreted the Plan's provision regarding subrogation, and thus, it did not breach its ERISA-imposed fiduciary duty.

Although the district court acknowledged the second offered subrogation form was contrary to the SPD's language, the court found the error harmless because the Alves could have signed the first subrogation agreement offered to them. As for the breach of fiduciary duty claim based on the Plan's attempt to hire the Alves' attorney, the district court pointed out that the "offer" of hiring the Alves' attorney came from Johnson Brokers and Administrators, not the Plan. Johnson Brokers was hired by the Plan to administer claims submitted to the Plan. The Alves did not present any evidence attributing the offer from the Plan itself.

The Alves now appeal the district court's holdings that the Plan's subrogation and refund rights are not subject to the Make Whole rule and that the Plan did not breach its fiduciary duties to the Alves.

## STANDARD OF REVIEW

Review of a grant of summary judgment is *de novo*, applying the same legal standard used by the district court. See Charter Canyon Treatment Ctr. v. Pool Co., 153 F.3d 1132, 1135 (10th Cir. 1998). A district court's review of a beneficiary's challenge to a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) applies an "arbitrary and capricious" standard to a plan administrator's actions if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms. See Kimber v. Thiokol Corp., 196 F.3d 1092, 1097 (10th Cir. 1999) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989)). In this case, the district court determined the Plan's SPD did grant the administrator such discretionary authority and applied the arbitrary and capricious standard. On appeal, the Alves do not challenge this determination.

When reviewing under the arbitrary and capricious standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary and capricious. . . . The decision will be upheld unless

it is not grounded on *any* reasonable basis.  The reviewing court need only assure

that the administrator's decision fall[s] somewhere on a continuum of

reasonableness–even if on the low end."  Id. at 1098 (internal citations and

quotations omitted).

## THE MAKE WHOLE DOCTRINE

ERISA itself is silent with respect to subrogation and reimbursement,

neither requiring a welfare plan to contain a subrogation clause, nor baring such a

clause or otherwise regulating its content.  See Member Servs. Life Ins. Co. v.

American Nat. Bank and Trust Co. of Sapula, 130 F.3d 950, 958 (10th Cir. 1997)

(citing Ryan v. Federal Express Corp., 78 F.3d 123, 127 (3d Cir. 1996)).   ERISA,

of course, preempts state law dealing with the interpretation of an ERISA-

governed plan unless the plan involves the purchase of an insurance policy as the

method of providing plan benefits.  See FMC Corp. v. Holliday, 498 U.S. 52, 111

S.Ct. 403, 112 L.Ed.2d 356 (1990) (holding a state subrogation rule preempted).[2]

In the absence of such statutory guidance, federal courts may create federal

common law for the use in ERISA cases.  See Pilot Life Ins. Co. v. Dedeaux, 481

U.S. 41, 56, 107 S.Ct. 1549, 1557-58, 95 L.Ed.2d 39 (1987); see also Cutting v.

---

[2]  There is some authority that state subrogation laws, such as a state's Make Whole rule, would not be preempted in cases involving insured ERISA plans, rather than self-funded plans.  See Blue Cross & Blue Shield of Alabama v. Fondren, 966 F.Supp. 1093, 1097 (M.D.Ala. 1997).

Jerome Foods, Inc., 993 F.2d 1293, 1297 (7th Cir. 1993) ("[Federal] courts have to adopt *some* interpretive principles, even if only implicit ones, in order to construe ERISA plans, since ERISA sets forth no principles of interpretation of its own. And those principles that the judges devise or adopt to guide their interpretations are therefore common law, that is judge made, principles."). In adopting a rule of interpretation as federal common law, this court has previously stated that it is "guided by the Supreme Court's admonition that 'ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.'" Member Servs., 130 F.3d at 954 (quoting Firestone Tire, 489 U.S. at 113, 109 S.Ct. at 956 (internal quotations and citations omitted)). However, this court has also cautioned that "'the power [of federal courts] to develop common law pursuant to ERISA does not give carte blanche power to rewrite the legislation to satisfy [the court's] proclivities.' Instead, the courts must continue to implement the policies of ERISA." Resolution Trust Corp. v. Financial Insts. Retirement Fund, 71 F.3d 1553, 1556 (10th Cir. 1995); see also Sunbeam-Oster Co. Group Benefits Plan v. Whitehurst, 102 F.3d 1368, 1374 (5th Cir. 1996) ("[E]ven though we may borrow from analogous state law when it is not inconsistent with congressional policy concerns, our formulation of federal common law in the instant situation must remain guided foremost by the congressional policies expressed or implicit in

ERISA.").

In this case, the Alves urge the court to adopt the Make Whole doctrine under federal common law for the interpretation of ERISA plans. Because the expected total recovery from the third-party tortfeasor (the $ 100,000.00 offer from the tortfeasors insurer) would not "make whole" their actual damages ($ 103,514.24), the Plan would have no right to reimbursement of any benefits paid. Thus, the proposed reimbursement acknowlegment forms expanded the Plans rights to reimbursement and the Plan's refusal to pay benefits until the Alves signed either reimbursement acknowledgment form constituted a wrongful denial of benefits and breach of the Plan's fiduciary duties.[3]

The Make Whole doctrine is a creature of equitable insurance law and is generally stated as:

---

[3] The district court in Cagle v. Bruner, 921 F.Supp. 726 (M.D.Fla. 1995), aff'd and remanded, 112 F.3d 1510 (11th Cir. 1997) concluded an ERISA plan abused its discretion by conditioning the payment on benefits on the signing of a supplemental subrogation form because the supplemental form expanded the plan's ability to recover beyond what was described in the SPD. See id. at 740. The Eleventh Circuit, however, reversed this specific ruling on the basis the SPD stated that "[the participant or beneficiary] may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund." Cagle v. Bruner, 112 F.3d 1510, 1520 (11th Cir. 1997). The court reasoned "[t]hat language can be read to require execution of the subrogation agreement before payment as easily as it can be read to require execution of the agreement after payment. Thus, the Fund's interpretation is not unreasonable, given the language of the plan." Id. The Eleventh Circuit did not discuss whether the supplemental subrogation agreement broadened the rights of the ERISA plan over those rights granted to it in the SPD.

> in the absence of contrary statutory law or valid contractual obligations to the contrary, the general rule under the doctrine of equitable subrogation is that where an insured is entitled to receive recovery for the same loss from more than one source, e.g., the insurer and the tortfeasor, it is only after the insured has been fully compensated for all of the loss that the insurer acquires a right to subrogation, or is entitled to its subrogation rights. The rule applies as well to instances in which the insured has recovered from the third party and the insurer attempts to exercise its subrogation right by way of reimbursement against the insured's recovery.

16 Couch on Insurance 3d § 223:134 at 147-150 (2000) (footnotes omitted). As the Fifth Circuit explained in Sunbeam-Oster Co., the Make Whole doctrine is one of three alternative rules a court could apply in establishing a ranking or priority between the Plan and the beneficiary in a partial recovery situation. See Sunbeam-Oster Co., 102 F.3d at 1373-74. The other two include a "Plan Priority" rule, under which priority is given to the ERISA plan for full recovery "off the top." Id. The other is a "Pro Rata" system, under which the plan and the beneficiary share ratably in the beneficiary's recovery from third parties. See id. at 1374.

The Tenth Circuit has not yet had the opportunity to determine which priority ranking plan is to be adopted for purposes of ERISA plan interpretation. Several of our sister circuits have adopted the Make Whole rule into federal common law as a default rule. See, e.g., Copeland Oaks v. Haupt, 209 F.3d 811, 813-14 (6th Cir. 2000); Cagle v. Bruner, 112 F.3d 1510, 1521-22 (11th Cir. 1997); Barnes v. Indep. Auto. Dealers Ass'n of Cal., 64 F.3d 1389,1394-95 (9th Cir.

1995).  Other circuit courts have declined to do so.  See, e.g., Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 280-81 (1st Cir. 2000) (declining adoption of Make Whole rule because rule conflicts with policy objectives of ERISA); Waller v. Hormel Foods Corp., 120 F.3d 138, 140 (8th Cir. 1997) (finding standard subrogation language in SPD provided plan with priority subrogation rights and rejecting Make Whole rule because reasons for adoption under insurance law do not transport easily into employee benefit plans); Sunbeam-Oster Co., 102 F.3d at 1378 (stating, in *dicta*, that even in absence of standard subrogation language in the SPD, it doubted it would adopt Make Whole doctrine as a default rule).

The Alves urge the court to adopt the Make Whole doctrine as federal common law for the interpretation of ERISA plans.  The Plan, on the other hand, takes the position that even if the court were to adopt the Make Whole doctrine, the doctrine is only a default rule and that it specifically rejected the doctrine in its SPD by its provision of a plan priority rule.  Furthermore, the Plan argues that the real question is whether it abused its discretion in interpreting the SPD language as providing for a plan priority reimbursement.  The district court agreed with the Plan's argument and we now affirm.

Although this circuit has not yet had the opportunity to decide which priority rule to apply to ERISA plans, we do have guidance from a previous

-15-

diversity case in which we were asked to explore the Make Whole doctrine under Oklahoma law. See Fields v. Farmers Ins. Co., Inc., 18 F.3d 831 (10th Cir. 1994). Similar to the facts in this case, the plaintiff in Fields, a beneficiary under a private insurance policy, sought a declaratory judgment that, because his total injuries exceeded the amount he recovered from third-parties, the insurance company could not be reimbursed from monies received from the third-parties. See id. at 834. After determining that no directly on-point Oklahoma authority existed on the issue, this court determined that even if Oklahoma were to adopt the Make Whole doctrine, the parties sufficiently contracted out of what is considered a default rule by the standard subrogation language contained in the insurance policy. See id. at 834-36. Specifically, the policy provided:

SUBROGATION

Subrogation means the Plan's right to recover any of its payments (1) made because of any injury to you or your dependent caused by a third party and (2) which you or your dependent later recover from the third party or the third party's insurer.

SUBROGATION RIGHTS

If you or your dependent sustain an injury caused by a third party, the Plan will pay for the injury, subject to (1) the Plan being subrogated to any recovery or any right of recovery you or your dependent has against that third party, including the right to bring suit in your name; (2) your not taking any action which would prejudice the Plan's subrogation right; and (3) your cooperating in doing what is reasonably necessary to assist the Plan in any recovery. The Plan will be subrogated

-16-

only to the extent of Plan benefits paid because of the injury. Id. at 834-35. Although the Oklahoma Supreme Court had applied the Make Whole doctrine  in a case of *equitable* subrogation, see id. at 835 (citing Gentry (L.A.), d/b/a/ Gentry Enters., Inc. v. American Motorist Ins. Co., 867 P.2d 468 (Okla 1994)), this court refused to expand that holding to a case involving an insurance policy containing a subrogation clause.  This court noted that those jurisdictions which have adopted the Make Whole doctrine have done so as a mere default rule and allow the rule to be overridden by a provision in an insurance contract.  See id.  The above quoted subrogation language, this court found, was such an overriding provision:

> Here, the clear language of the insurance contract provides that [the insurance company] shall be subrogated to *any* recovery that plaintiff receives from the negligent third party or its insurer. Plaintiff has not identified, nor have we discerned, public policies that would compel the Oklahoma court to disregard the clear and unambiguous subrogation provisions of this insurance  contract.

Id. at 836.

Those circuits which have adopted the Make Whole doctrine for the interpretation of ERISA plans have only done so to the extent the doctrine represents a default rule.  In this case, there is no need for us to determine the default rule because, like the insurance policy in Fields, the Plan's SPD specifically provided for reimbursement from third-party recovery.  If we were to find the standard subrogation language in Fields sufficient to override a possible

default Make Whole rule, certainly we should find the specific priority language found in the Plan's SPD to be more than adequate. The Plan's SPD language went beyond the language contained in the Fields insurance contract. The language provided that the Plan's subrogation and reimbursement rights "provide the Plan with a priority over any funds paid by a third party. . . ." (Summary Plan Description at 34) (emphasis added). Even the Eleventh Circuit would find such language sufficient to override the Make Whole doctrine and provide the Plan with a priority over third-party recovery. See Cagle v. Bruner, 112 F.3d 1510, 1521-22 (11th Cir. 1997) (holding *standard* subrogation language insufficient to overcome the Make Whole doctrine, even in cases applying an arbitrary and capricious standard of review). The Plan's use of the word **priority** in its subrogation clause "specifically allowed the Plan the right of first reimbursement out of any recovery [the Alves were] able to obtain even if [the Alves] were not made whole." Barnes v. Indep. Auto. Dealers of Cal., 64 F.3d 1389, 1395 (9th Cir. 1995) (quoted in Cagle, 112 F.3d at 1522). Cf. Sanders v. Scheideler, 816 F.Supp. 1338, 1347 (W.D.Wis. 1993) (adopting Make Whole rule, but only as "a default rule to be applied only when a plan fails to designate priority rules or provide its fiduciaries with the discretion necessary to construe the plan accordingly.").

**BREACH OF FIDUCIARY DUTY**

-18-

ERISA's section 404(a) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." 29 U.S.C. § 1104; see also Varity Corp. v. Howe, 516 U.S. 489, 505, 116 S.Ct. 1065, 1074, 134 L.Ed.2d 130 (1996) (stating that a fiduciary's knowing and significant participation in the deception of a plan's beneficiary "in order to save the employer money at the beneficiaries' expense" constitutes a breach of fiduciary duty under ERISA). The Alves contend the Plan breached its duty to them by (1) refusing to pay the medical bills; (2) requiring the Alves to sign either of the two offered reimbursement acknowledgment forms; and (3) soliciting the Alves' attorney to represent the Plan's interests in the case against the third-party tortfeasor. We address each claim in turn.

First, the Alves claim the Plan breached its fiduciary duty to them by not paying and processing their claims. The Alves focus on the district court's finding that the Plan's right of subrogation does not vest until after the Plan pays benefits and they argue that "[i]nstead of first paying the medical benefits due under the terms of the plan in a timely manner, the Plan instead focused on its claimed right of subrogation and refund." Appellants' Brief at 14. The Alves, however, confuse the Plan's right of subrogation and its right to require the Alves

to sign a document recognizing its right to later subrogation and reimbursement.

The Plan's SPD provides that:

> When a right of recovery exists, the Covered Person will execute and deliver all required instruments and papers as well as doing whatever else is needed to secure the Plan's right of subrogation **as a condition to having the Plan make payments.**

(Summary Plan Description at 34) (emphasis added). Although the right of subrogation did not technically exist, the Plan did not act arbitrarily and capriciously in requiring the Alves to sign a reimbursement acknowledgment form prior its paying medical benefits based on the above cited language of its SPD. In Cagle v. Bruner, 112 F.3d 1510 (11th Cir. 1997), the Eleventh Circuit, faced with a similar argument, came to the same conclusion:

> On the "reasonable interpretation" factor, the district court determined that the Fund unreasonably interpreted the plan to allow it to require a signed subrogation agreement prior to paying benefits. According to Bruner, the district court correctly found the Fund's position to be unreasonable, because the Fund has no right of subrogation until benefits are paid. We believe that Bruner is confusing the issues. It is true that because the Fund has no right of subrogation until the plan pays benefits, it cannot enforce the subrogation agreement until it pays benefits. Nevertheless, nothing in the plan forbids the Fund from requiring the agreement to be signed before it pays any claims. The SPD states that "[the participant or beneficiary] may be asked to execute documents or take such other action as is necessary to assure the rights of the Fund." That language can be read to require execution of the subrogation agreement before payment as easily as it can be read to require execution of the agreement after payment. Thus, the Fund's interpretation is not unreasonable, given the language of the plan.
>
> When we consider the practical reasons for requiring the

-20-

subrogation agreement to be signed before paying any benefits, the reasonableness of that policy becomes abundantly clear. The Fund uses the subrogation agreements in negotiations with at-fault third parties. Once benefits are paid, participants and beneficiaries have little incentive (other than the fear of a lawsuit) to sign a subrogation agreement. If the Fund cannot require the agreement beforehand, it often will have to resort to lawsuits or at least the threat of lawsuits to obtain the agreements. Lawsuits cost money, sometimes a lot of it. In addition, delay becomes inevitable, and while the Fund is attempting to obtain the agreements from participants and beneficiaries, the Fund is hampered in its negotiations with at-fault third parties. In short, having the agreement in hand before paying benefits provides significant protection to trust assets. Cost concerns weigh in favor of the Fund's policy.

Id. at 1520.

Next, the Alves contend the Plan breached its fiduciary duty by requiring them to sign a reimbursement agreement which "impermissibly broadened the Plan's rights beyond those contained in the Plan document." Appellants' Brief at 15. The district court found the first offered reimbursement acknowledgment form did not broaden the Plan's rights from those in the SPD. As explained above, the Plan had a right to a priority reimbursement from any recovery from a third-party. The district court did find the second offered supplemental reimbursement acknowledgment form to provide the Plan with rights not provided to it under the terms of the plan. However, as the district court explained, the Alves were not harmed by such a discrepancy because the Plan would have paid the claims had the Alves signed the first offered reimbursement agreement.

Last, we affirm the district court's finding that the Plan did not breach its

fiduciary duty to the Alves by attempting to hire their attorney. As with their motion for summary judgment before the district court, the Alves, in their brief, again rely on a letter from the third party administrator, Johnson Brokers and Administrators, to their attorney. To the extent the solicitation could be deemed inappropriate, the Alves once again fail to make any argument in favor of attributing the letter to the Plan. Thus, the Plan could not have breached its fiduciary duty to the Alves based on the third-party administrator's conduct.

## CONCLUSION

For the above reasons, we AFFIRM the decision of the district court.


Entered for the Court,


Monti L. Belot
District Judge