# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

_____

R. CHARLES DEBOARD; LILLIAN J. DEBOARD; WILLIAM T. WOOD; MARY E. WOOD; LUCILLE M. KISTLER; KNOX VAN HOY; MARTHA VAN HOY,

      Plaintiffs-Appellees and Cross-Appellants,

      v.

SUNSHINE MINING AND REFINING COMPANY; SUNSHINE PRECIOUS METALS INC.; WOODS RESEARCH AND DEVELOPMENT CORPORATION,

      Defendants-Appellants and Cross-Appellees.

_____

No. 97-6226
No. 97-6249

R. CHARLES DEBOARD; LILLIAN J. DEBOARD; WILLIAM T. WOOD; MARY E. WOOD; LUCILLE M. KISTLER; KNOX VAN HOY; MARTHA VAN HOY,

      Plaintiffs-Appellants,

      v.

SUNSHINE MINING AND REFINING COMPANY; SUNSHINE PRECIOUS METALS INC.; WOODS RESEARCH AND DEVELOPMENT CORPORATION,

No. 98-6020

Defendants-Appellees.

---

ORDER
Filed May 2, 2000

---

Before **TACHA**, **BRISCOE**, and **MURPHY**, Circuit Judges.

---

These matters are before the court on appellants' petition for rehearing with suggestion for rehearing en banc. Upon review, the panel grants rehearing for the limited purpose of correcting the court's slip opinion filed on April 5, 2000. An amendment has been made in the section entitled "Plaintiffs' cross-appeals," subsection "Extent of coverage under new plan." Accordingly, a revised published opinion is attached to this order. The panel otherwise denies the petition.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the suggestion is denied.

Entered for the Court
PATRICK FISHER, Clerk of Court

By:
Keith Nelson
Deputy Clerk

2

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 2 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

R. CHARLES DEBOARD; LILLIAN J.
DEBOARD; WILLIAM T. WOOD;
MARY E. WOOD; LUCILLE M.
KISTLER; KNOX VAN HOY;
MARTHA VAN HOY,

    Plaintiffs-Appellees and Cross-
Appellants,

      v.

SUNSHINE MINING AND REFINING
COMPANY; SUNSHINE PRECIOUS
METALS INC.; WOODS RESEARCH
AND DEVELOPMENT
CORPORATION,

    Defendants-Appellants and Cross-
Appellees.

No. 97-6226
No. 97-6249

---

R. CHARLES DEBOARD; LILLIAN J.
DEBOARD; WILLIAM T. WOOD;
MARY E. WOOD; LUCILLE M.
KISTLER; KNOX VAN HOY;
MARTHA VAN HOY,

    Plaintiffs-Appellants,

      v.

No. 98-6020

SUNSHINE MINING AND REFINING COMPANY; SUNSHINE PRECIOUS METALS INC.; WOODS RESEARCH AND DEVELOPMENT CORPORATION,

Defendants-Appellees.

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-95-1117-A)

---

Gayla C. Crain, of Epstein, Becker & Green, P.C., Dallas, Texas (Michael P. Butler, of Epstein, Becker & Green, P.C., Dallas, Texas; and Bruce C. Jones, of Evans, Keane, Boise, Idaho, with her on the brief), for the appellants.

Kirk D. Fredrickson (Jean A. McDonald with him on the brief), of McDonald & Fredrickson, P.C., Oklahoma City, Oklahoma, for the appellees.

---

Before **TACHA**, **BRISCOE**, and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiffs, former employees of a corporate subsidiary of defendant Sunshine Mining & Refining Company, filed this action under the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., seeking to enforce promises of life-time insurance benefits made to them by their former employer as inducements to early retirements. Defendants appeal from the district court's entry of partial summary

2

judgment and its subsequent entry of judgment in favor of plaintiffs. Defendants also appeal the district court's award of fees and costs to plaintiffs. Plaintiffs have filed two cross-appeals challenging various aspects of the district court's judgment, the amount of the fee award, and the district court's refusal to grant plaintiffs' post-trial motion to enforce judgment. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. As regards defendants' appeal, we affirm. As regards plaintiffs' cross-appeals, we affirm in all respects except for (1) the health insurance coverage issue, which we reverse and remand for entry of judgment consistent with this opinion, and (2) the fee award, which we reverse and remand to the district court for further consideration.

I.

Plaintiffs Charles Deboard, William Wood, Lucille Kistler, and Knox Van Hoy are former employees of Woods Petroleum Corporation (Woods), a corporation formerly based in Oklahoma City, Oklahoma. On July 31, 1985, Woods merged with, and became a wholly owned subsidiary of, Sunshine Mining & Refining Company (Sunshine). As part of the merger (which was described in the record as more akin to a hostile takeover), Sunshine agreed not to terminate or modify any existing Woods' employee welfare benefit plans for a period of ten years.

On August 22, 1985, Woods distributed a memorandum to its employees explaining that, due to a "cyclical downturn" in the oil and gas industry, cost-cutting measures would be required by all four of Sunshine's oil and gas subsidiaries, including

3

Woods. The memorandum further explained that a task force had been formed to consider and evaluate various options to restructure Sunshine's oil and gas group. App. at 143. On September 11, 1985, Woods distributed a follow-up memorandum to its employees informing them, in pertinent part, of a "voluntary early retirement subsidy" intended by management to help reduce costs. Id. at 110. The memorandum indicated that "[e]ligible Woods' personnel [could] elect to retire early with additional vesting rights only during a 'window period' beginning September 18, 1985 and ending October 31, 1985." Id. The memorandum further indicated management was "working on and w[ould] finalize the details of a program which w[ould] provide an incentive to a wider group of people who m[ight] voluntarily elect to retire early with higher vesting rights," and "[t]he details w[ould] be announced" the following week. Id.

Within a week, Woods issued at least two memoranda outlining the details of the voluntary early retirement subsidy. Under what Woods termed a "Rule of 70" qualification, any employee whose age and years of service plus five years equaled 70 or greater was eligible to take advantage of the subsidy.[1] Eligible employees expressed reluctance to participate in the voluntary early retirement subsidy because of concern about the handling of post-retirement insurance benefits.

On October 3, 1985, Woods sent letters to all employees eligible for the proposed

---

[1] This apparently differed from Woods' normal retirement qualification in that it allowed employees to add five years to their age/years of service.

4

Rule of 70 early retirement subsidy, including plaintiffs.[2]  The letters stated:

> For informational purposes only, this letter serves to advise you and your spouse of insurance entitlements which you would be eligible to receive should you voluntarily elect to retire during the window period under the Rule of 70 plan (the "Plan").
>
> First, the Plan provides that you and your eligible dependents would be entitled to receive health care under our current group hospitalization plan with Massachusetts Mutual, fully paid for at Woods Petroleum Corporation's expense until the time of your death.  At that time, the hospitalization insurance would continue in full force for one year from the anniversary date of the retiree's death for the retiree's spouse at no cost to your spouse.  However, within the year period from the date of the retiree's death, should the spouse remarry, all coverage would cease immediately.  After the year passes, the spouse may elect to convert to a private plan with Massachusetts Mutual with the cost being borne 100% by the spouse.  During your lifetime, you would simply submit your claims for reimbursement to the Company (via the Personnel Department) as you do now.  Once converted to a private plan, your premiums and claims would be handled direct with the insurance carrier instead of Woods Petroleum Corporation.
>
> Secondly, you would be allowed to continue participation in the Group Dental Plan at company expense with the same procedure for claim reimbursement as indicated above.  Once you are deceased, however, there would be no further benefits or automatic rights of conversion to a private plan for your dependents in the Dental Plan.
>
> Third, as a part of our Group Plan coverage, you would also be covered for $10,000 life insurance on you and $5,000 on your spouse with Security Connecticut, with the premiums for these coverages also paid by the Company.
>
> Something that you do need to keep in mind, once you become age 65, you would need to submit your claims first to Medicare, as it would then become the primary carrier.  You would then submit any amounts not paid by Medicare to Massachusetts Mutual as the secondary carrier.  (Be sure that you apply for Medicare upon turning age 65.)

---

[2]  One of the plaintiffs, Lucille Kistler, was mailed an identical letter dated October 2, 1985.  App. at 1318.  For purposes of convenience, we will refer collectively to the letters as the "October 3, 1985 letters" or "the October 3 letters."

5

If there is anything else that we can do to assist you with your pre-retirement planning, do not hesitate to call upon us.

Id. at 116-17. Based upon the representations in the October 3 letters, plaintiffs Deboard, Wood, and Kistler voluntarily retired from the company effective October 31, 1985. These plaintiffs and their spouses subsequently received medical, dental, and life insurance benefits, at company expense, through July 1995.

On July 14, 1986, Woods distributed a memo to employees and retirees outlining various modifications to the health, life, and dental insurance programs. Id. at 1326. In particular, the memo stated employees would "be required to contribute to the premium payments for dependent coverage only, at a rate of $20.00 per month beginning August 1, 1986." Id. On July 18, 1986, Woods distributed a memo to all retirees stating, in pertinent part, as follows:

> The correspondence you received last week describing the changes to our group health, life, and dental plans was for informational purposes to keep you appraised (sic) of the changes that will be impacting on you as well as our active employees.
> The item . . . which described the requirement for employees to begin contributing $20 per month for family coverage is not applicable to our current retirees; but, may affect future retirees.

Id. at 1329.

In the fall of 1986, Woods offered a second voluntary retirement subsidy to those employees who satisfied the "Rule of 70." The second subsidy differed slightly in that no spousal life insurance was offered, and eligible retirees had to pay $20 per month for dependent health care coverage (consistent with the August 1, 1986, changes to the health

6

insurance plan for employees).  Plaintiff Van Hoy inquired about the second subsidy and was informed by Woods' personnel director that, with the exception of the two noted differences, the terms and conditions of the subsidy were identical to those described in the October 3, 1985, letters.  Plaintiff Van Hoy chose to participate in the second subsidy and retired effective December 31, 1986.  Van Hoy and his spouse subsequently received benefits, at company expense (save for the $20 monthly co-pay on Mrs. Van Hoy's medical insurance premiums), through July 1995.

Woods was the plan sponsor until July 31, 1986.  Effective August 1, 1986, Sunshine adopted and consolidated medical coverage for itself and its subsidiaries, including Woods, into group policies issued by Massachusetts Mutual Life Insurance Company (which had previously issued group policies to Woods for its Welfare Plan).  Thereafter, Sunshine effectively acted as the administrator for all of the plans at issue.

On April 26, 1995, Woods (which had since been renamed Woods Research & Development Corporation), sent letters to plaintiffs and their spouses stating:

> This letter is to inform you of changes to your Woods retiree insurance coverage effective August 1, 1995.  As you know, Sunshine Mining Company (Sunshine) acquired Woods Petroleum Corporation on July 31, 1985.  Pursuant to Section 6.16 of the Agreement and Plan of Reorganization, Sunshine agreed not to terminate any employee benefit plans (including health and welfare plans) for a period of 10 years.  Sunshine has elected not to terminate your retiree medical insurance provided you pay a premium equal to the cost to continue your coverage after July 31, 1995 (the expiration of the 10 year period).  Your dental insurance and retiree and dependent life insurance coverage will cease as of August 1, 1995.
> In 1994, due to the prolonged slump in silver prices, the continuing

7

escalation in medical insurance cost and the need to reduce production and overhead costs, Sunshine eliminated retiree medical and dental coverage for its existing hourly and staff workforce and certain retired hourly employees. Sunshine is offering you the option of continuing your coverage by paying a monthly premium of $499.56 for you and your spouse. This premium will be adjusted annually to reflect any changes in Sunshine's cost to provide this coverage or changes to medical insurance provided. Sunshine may amend or terminate this coverage upon 60 days written notice to you.

To continue your medical insurance coverage, you must return the enclosed election form by July 31, 1995 to [Sunshine].

Id. at 151.

In a letter to Sunshine dated May 15, 1995, plaintiff Wood questioned the benefit termination decision. Wood attached a copy of his October 3, 1985, letter from Woods, and stated he agreed to accept early retirement under the Rule of 70 Plan only because of Woods' offer to provide him and his spouse with lifetime health, dental, and life insurance benefits. On May 30, 1995, Woods responded to Wood with the following letter:

The Rule of 70 Plan that you retired under in 1985 was offered by Woods Petroleum Corporation ("Woods") and was only available to Woods employees who were participants in the Woods Petroleum Corporation Employee Pension Plan. Your retiree life and medical benefits were also provided pursuant to a Woods policy. On July 31, 1995, Sunshine Mining & Refining Company's obligation to continue Woods' employee benefit plans ceases.

Id. at 156.

Plaintiffs Deboard and Wood hired counsel, and by letter dated June 29, 1995, opposed Sunshine's decision to terminate their insurance coverage under the Rule of 70 Plan. The letter requested that Sunshine provide Deboard and Wood with various

8

documents concerning the plans, provide them with a statement of specific reasons for termination of their insurance coverage, notify them of any additional information necessary to decide the issue, and provide or disclose any other procedures with which they should comply. Woods responded on July 11, 1995, by providing copies of various documents pertaining to the insurance plans at issue, but it did not alter or further explain the decision to discontinue payment of insurance premiums on behalf of plaintiffs.

Plaintiffs filed suit against defendants on July 25, 1995, seeking declaratory and injunctive relief, as well as compensatory damages. On March 13, 1996, plaintiffs moved for summary judgment. Defendants responded with a cross-motion for summary judgment. On July 22, 1996, the district court granted plaintiffs' motion in part, denied it in part, and denied defendants' motion in its entirety. In pertinent part, the district court concluded "there [wa]s no genuine issue of material fact regarding whether the 'Rule of 70 Plan' existed as a separate plan under ERISA," but that "genuine issues of material fact exist[ed] as to whether Defendants either misrepresented the duration of benefits under the plan, or improperly amended the plan." Id. at 670. The district court further concluded defendants violated ERISA by failing to provide plaintiffs Deboard and Wood with copies of the merger agreement between Sunshine and Woods, which defendants claimed gave them authority to discontinue the payment of insurance premiums on behalf of plaintiffs. Id.

The remaining aspects of the case proceeded to trial and the district court orally

9

entered its findings of fact and conclusions of law on October 31, 1996. The district court found in favor of plaintiffs on their claims of breach of fiduciary duty and for entitlement to continuing payment of benefit insurance premiums by defendants. Id. at 1291. The court ordered that plaintiffs "be restored to their status as to company-defrayed health insurance premiums as that status was in effect on the day after their respective retirements." Id. at 1299. With respect to dental and life insurance coverage, the district court found "the October Three plan [wa]s not explicit about the lifetime aspect of . . . company-paid premiums," and concluded plaintiffs were entitled to no remedy with respect to those plans. Id. The district court did not impose any penalties on defendants for failing to timely provide plaintiffs Deboard and Wood with copies of the merger agreement.

Plaintiffs moved for fees and costs, and defendant filed a cross-motion for partial recovery of fees and costs. The district court awarded attorney fees in the amount of $95,795.44 to plaintiffs.

## II.

### *Defendants' appeal*

*Appellate jurisdiction/timeliness of appeal*

Plaintiffs have moved to dismiss a portion of defendants' appeal for lack of jurisdiction. According to plaintiffs, defendants had thirty days from the district court's February 19, 1997, resolution of defendants' cross-motion for fees and costs to appeal the

underlying judgment on the merits. Because defendants waited until after the district court's resolution of plaintiffs' fee request, plaintiffs contend defendants' notice of appeal is effective only as to the portion of the judgment pertaining to plaintiffs' fee request (i.e., the only portion of the judgment entered within thirty days of the notice of appeal).

Rule 4 of the Federal Rules of Appellate Procedure sets forth "mandatory and jurisdictional" time requirements for appealing a judgment in a civil case. Browder v. Director, Dep't of Corrections of Illinois, 434 U.S. 257, 264 (1978). In pertinent part, Rule 4 provides[3]:

> (a)(1) Except as provided in paragraph (a)(4) of this Rule, in a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 must be filed with the clerk of the district court within 30 days after the entry of the judgment or order appealed from . . . .
> &ast; &ast; &ast;
> (4) If any party files a timely motion of a type specified immediately below, the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding. This provision applies to a timely motion under the Federal Rules of Civil Procedure:
> &ast; &ast; &ast;
>> (D) for attorney's fees under Rule 54 if a district court under Rule 58 extends the time for appeal; [or]
>> (E) for a new trial under Rule 59 . . . .

As referenced in Rule 4, Rule 58 of the Federal Rules of Civil Procedure allows a district court, before a notice of appeal has been filed, to "order that [a] motion [for taxation of costs and fees] have the same effect under Rule 4(a)(4) of the Federal Rules of Appellate

---

[3] Rule 4 was modified effective December 1, 1998. We have relied on the prior version of Rule 4 in effect at the time the relevant procedural events in this case occurred.

Procedure as a timely motion under Rule 59." Id.

Here, defendants did not rely on the basic thirty-days-from-entry-of-judgment "window" provided by Federal Rule of Appellate Procedure 4(a)(1), which would have given them thirty days from the entry of judgment on January 6, 1997, or until February 6, 1997, to file their notice of appeal. Instead, defendants sought to extend the time for filing their notice of appeal by moving the district court to order, pursuant to Federal Rule of Civil Procedure 58, that their cross-motion for fees and costs "have the same effect under Rule 4(a)(4) of the Federal Rules of Appellate Procedure as a timely-filed motion under Rule 59." App. at 887. Because the district court granted defendants' motion, the thirty-day period for filing a notice of appeal did not begin to run until "the entry of the order disposing of" defendants' cross-motion for fees and costs.[4] Fed. R. App. P. 4(a)(4).

The timeliness of defendants' appeal turns on when the district court's order disposing of their cross-motion for fees and costs was "entered" for purposes of Rule 4(a)(4). Federal Rule of Appellate Procedure 4(a)(7) provides that an "order is entered

---

[4] Defendants contend once the district court ordered that their cross-motion for fees would have the same effect for purposes of Rule 4(a)(4) as a Rule 59 motion, the time period for filing a notice of appeal did not begin to run until all outstanding fee motions were resolved. This contention finds no support in the language of Rule 4(a)(4). Although the time period for filing a notice of appeal does not begin to run until all of the types of motions listed in Rule 4(a)(4) are resolved by the district court, fee motions qualify only if "a district court under Rule 58 extends the time for appeal." Fed. R. App. P. 4(a)(4)(D). Here, the district court did not order that resolution of plaintiffs' motion for fees would extend the time for appeal. Thus, the thirty-day period for filing a notice of appeal began to run upon the resolution of the single outstanding Rule 4(a)(4) motion, i.e., defendants' cross-motion for fees.

12

within the meaning of . . . Rule 4(a) when it is entered in compliance with Rules 58 and 79(a) of the Federal Rules of Civil Procedure." Fed. R. App. P. 4(a)(7). In turn, Federal Rule of Civil Procedure 58 provides, in pertinent part, that "[e]very judgment shall be set forth on a separate document," and "is effective only when so set forth and when entered as provided in Rule 79(a)." Fed. R. Civ. P. 58; see Bankers Trust Co. v. Mallis, 435 U.S. 381, 384 (1978) (noting purpose of Rule 58 is to eliminate confusion as to exactly when the time for filing a notice of appeal begins to run); Clough v. Rush, 959 F.2d 182, 184-85 (10th Cir. 1992) (discussing history and purpose of Rule 58).

Although the district court issued an order on February 19, 1997, denying defendants' cross-motion for fees, that order did not meet the requirements of Rule 58. In particular, the order was six pages long and contained legal analysis and reasoning. See Clough, 959 F.2d at 185 (concluding 15-page order containing legal analysis and reasoning did not satisfy Rule 58 requirements). Thus, the order "could not, standing alone, trigger the appeal process." Id. In reaching this conclusion, we recognize that many courts have held a separate document is unnecessary in situations where a district court issues an order denying a Rule 59 or Rule 60(b) motion. See Marre v. United States, 38 F.3d 823, 825 (5th Cir. 1994); Wright v. Preferred Research, Inc., 937 F.2d 1556, 1560 (11th Cir. 1991); Hollywood v. City of Santa Maria, 886 F.2d 1228, 1231 (9th Cir. 1989); Charles v. Daley, 799 F.2d 343, 347-48 (7th Cir. 1986). But see Fiore v. Washington Co. Comm. Mental Health Ctr., 960 F.2d 229, 234-35 (1st Cir. 1992).

13

Without deciding that particular issue, we conclude that, because motions for attorney fees are separate from and collateral to any decision on the merits, see White v. New Hampshire, 455 U.S. 445, 451-52 (1982), they should be accorded the same dignity under Rule 58 as judgments on the merits. Just as a judgment on the merits must always be accompanied by a separate document, so should a district court's order denying or granting a motion for fees.

Having examined the record on appeal, it is our conclusion that Rule 58's separate document requirement was not actually satisfied in this case. Although the district court issued a one-page judgment on June 9, 1997, that document was narrowly confined to the granting of plaintiffs' fee request. Thus, the district court's denial of defendants' cross-motion for fees was not "entered" in accordance with Rule 58, and the thirty-day time period for appealing that denial and the underlying judgment never began to run. Nevertheless, since there is "no question . . . as to the finality of the district court's decision," either on the merits or as to the defendants' cross-motion for fees, we may properly exercise jurisdiction over all of the issues raised in defendants' appeal pursuant to 28 U.S.C.§ 1291. Bankers Trust, 435 U.S. at 382-88; Burlington Northern R.R. Co. v. Huddleston, 94 F.3d 1413, 1416 n.3 (10th Cir. 1996).

*Creation of new employee welfare benefit plan*

During the course of the proceedings, the district court granted partial summary

14

judgment in favor of plaintiffs, concluding the uncontroverted facts demonstrated the October 3, 1985, letters created a new ERISA plan, separate from the employee welfare benefit plan already in existence at Woods. On appeal, defendants challenge this ruling, contending "Woods did not intend to create a new and separate ERISA plan via the October 3rd letter, but merely described in the October 3rd letter the very same benefits to which Plaintiffs and others similarly situated were entitled under" Woods' existing medical insurance plan. Defs.' Opening Br., at 15. According to defendants, the existing medical plan contained a clause affording Woods the right to amend or terminate the plan at any point. Based upon this alleged clause, defendants contend plaintiffs had no vested rights in lifetime insurance benefits, leaving defendants free to subsequently alter the plan and require plaintiffs to pay their own insurance premiums.

We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Federal Rule of Civil Procedure 56(c). See McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir.1998). We also apply a de novo standard in determining whether ERISA governs a particular insurance policy or set of insurance benefits. Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997).

Section 1132(a) of ERISA provides, in relevant part, that a participant or beneficiary of a "plan" may bring suit "to recover benefits due to him under the terms of his plan . . . ." 29 U.S.C. § 1132(a)(1)(B). As used in ERISA, the term "plan" includes

15

"employee welfare benefit plans," 29 U.S.C. § 1002(3), which are plans "established or . . . maintained for the purpose of providing . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, [or] death . . . ." 29 U.S.C. § 1002(1). Defendants do not dispute that plaintiffs' retirement insurance benefits are provided under an employee welfare benefit plan governed by ERISA. Instead, defendants dispute the district court's conclusion that the October 3, 1995, letters created a new employee welfare benefit plan, separate from the one that already existed at Woods and provided benefits to employees and retirees.

It is without question that an employer can have more than one employee welfare benefit plan for purposes of ERISA. See, e.g., McMahon v. Digital Equip. Corp., 162 F.3d 28, 33 (1st Cir. 1998) (employer's short-term disability benefits program included three plans); Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 100 n.1 (2d Cir.) (employer established separate plans for union and non-union employees), cert. denied, 119 S. Ct. 178 (1998); Smith v. Ameritech, 129 F.3d 857, 860 (6th Cir. 1997) (employer offered two plans which provided disability benefits to employees); Weir v. Federal Asset Disposition Ass'n, 123 F.3d 281, 284-86 (5th Cir. 1997) (employer adopted three severance plans that provided benefits independent of each other). In Chiles v. Ceridian Corp., 95 F.3d 1505 (10th Cir. 1996), we were asked to determine whether four benefit plan documents should be treated as creating four separate plans or one comprehensive plan for purposes of ERISA. Although we cited various factors relevant to the

16

determination in that case, we emphasized the ultimate question was whether the evidence, considered as a whole, evinced an intent on the part of the company to establish one plan or four plans. Id. at 1511.

Applying Chiles in this case, we conclude the uncontroverted evidence submitted by the parties in connection with their summary judgment motions demonstrates Woods did, in fact, intend to create a new employee welfare benefit plan for those persons who took advantage of the voluntary early retirement subsidy. Prior to offering the voluntary early retirement subsidy, Woods had in place an employee welfare benefit plan offering health, dental, and life insurance coverage to its employees. Notably, the Summary Plan Description (SPD) for that plan was poorly drafted. Although the SPD stated that "health and dental benefits are paid for mainly by your employer," App. at 274, it said nothing about the extent to which Woods would cover those premiums, nor did it say anything about lifetime insurance benefits to employees and/or retirees. There is no support for defendants' assertion that Woods' existing employee welfare benefit plan allowed for the insurance benefits now at issue in this case. In accordance with the terms of the October 3, 1985, letters, we conclude Woods intended to create a new benefit plan for a specific group of employees, i.e., those employees who agreed to participate in the voluntary early retirement subsidy. Although defendants emphasize the letters opened with the phrase "[f]or informational purposes only," the language of the letters clearly indicates an intent on the part of Woods to provide plaintiffs with lifetime health insurance benefits, and

17

thereby to create a new limited benefit plan for plaintiffs. Moreover, the uncontroverted evidence indicates it was precisely the lifetime guarantee of insurance benefits that induced plaintiffs to participate in the voluntary early retirement subsidy.

In reaching this conclusion, we note the October 3 letters satisfied the minimum requirements for establishing an ERISA plan. Not only did the letters specify a funding mechanism for the plan (i.e., that Woods would pay the health insurance premiums), they also allocated ongoing operational and administrative responsibilities to the employer. See Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 12 (1987). In particular, Woods was required under the plan to regularly pay the health, dental, and life insurance premiums for plaintiffs, and was further required to allocate company resources to do so. Thus, in the words of the Supreme Court, the plan placed "periodic demands" on Woods' assets, "creat[ing] a need for financial coordination and control." Id. In addition to the periodic demands on Woods' assets, the plan also required Woods to keep track of when each retiree died because the plan expressly provided for more limited survival benefits for surviving spouses of retirees. Aside from establishing an administrative scheme, the documents sufficiently described the intended benefits (lifetime health insurance benefits, etc.), the intended class of beneficiaries (persons participating in the voluntary early retirement subsidy), and the procedures for receiving benefits. Siemon v. AT&T Corp., 117 F.3d 1173, 1178 (10th Cir. 1997). Finally, "in light of all the surrounding facts and circumstances, a reasonable employee would [have] perceive[d] an ongoing commitment

18

by the employer to provide employee benefits." Belanger v. Wyman-Gordon Co., 71 F.3d 451, 455 (1st Cir. 1995).

We note other circuits have found the existence of ERISA plans under similar circumstances. For example, in Williams v. Wright, 927 F.2d 1540 (11th Cir. 1991), the court held a letter to a single employee outlining pension and insurance benefits the employee would receive upon retirement created both an employee pension benefit plan and an employee welfare benefit plan for purposes of ERISA. Even though (as here) the payment of benefits occurred out of the employer's general funds rather than a separate trust, the court held the employer could not evade the requirements of ERISA where the facts otherwise demonstrated the existence of a plan. Id. at 1544. Similarly, in Cvelbar v. CBI Illinois Inc., 106 F.3d 1368 (7th Cir. 1997), the court concluded a written agreement entered into by plaintiff, a management employee, and defendant, the employer/bank, constituted an ERISA plan because it provided for continuing severance benefits upon plaintiff's termination. Id. at 1375-79.

In sum, we agree with the district court's conclusion that the October 3 letters created a new employee welfare benefit plan for purposes of ERISA.[5] See generally

---

[5] Although not specifically discussed by the parties, it is arguable there was a third ERISA plan created in the fall of 1996 when the company offered the second buyout program to its employees, including plaintiff Van Hoy. Assuming, arguendo, that a third plan was created, we conclude its terms were substantially similar to the plan created in the fall of 1995 via the October 3 letters (save for the $20 monthly co-pay requirement for dependent health care coverage).

Elmore v. Cone Mills Corp., 23 F.3d 855, 861 (4th Cir. 1994) (holding an "informal plan may exist independent of, and in addition to, a formal plan as long as the informal plan meets" all of the necessary requirements under ERISA).

*Terms of the new employee welfare benefit plan*

As a fall-back argument, defendants contend even if the October 3 letters created a new employee welfare benefit plan for purposes of ERISA, the new plan effectively incorporated a clause in the existing plan allowing Woods the right to amend or terminate at any time. For reasons outlined below, we find it unnecessary to conclusively determine whether that clause was incorporated into the new plan because, even if it was, the clause is ambiguous and does not provide Woods with the right to revoke its promise to pay plaintiffs' health insurance premiums.

Although ERISA pension plans are subject to mandatory vesting requirements, see 29 U.S.C. § 1053, ERISA employee welfare benefit plans are not subject to such standards, and employers are generally free to amend or terminate these plans unilaterally (assuming the plan provides for this right). See Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995). Nevertheless, an employer and employee may contract for vested post-employment welfare benefits. See Chiles, 95 F.3d at 1510; In re White Farm Equip. Co., 788 F.2d 1186, 1193 (6th Cir. 1986).

In deciding whether an ERISA employee welfare benefit plan provides for vested

benefits, we apply general principles of contract construction. In particular, "the Supreme Court has directed us to interpret an ERISA plan like any contract, by examining its language and determining the intent of the parties to the contract." Capital Cities/ABC, Inc. v. Ratcliff, 141 F.3d 1405, 1411 (10th Cir.) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112-13 (1989)), cert. denied, 525 U.S. 873 (1998). If we determine "the plan language is ambiguous, we may look at extrinsic evidence." Id.

Here, Massachusetts Mutual Life Insurance Company, the insurer for Woods' employee welfare benefit plan, issued an SPD in March 1985. The first page of the SPD (after the cover page) contains three separate headed paragraphs:

**INTRODUCTION**
This booklet is the Summary Plan Description of your employee benefit plan. This summary tells how you may become and remain a plan member. Your health and dental insurance benefits are paid for mainly by your employer. Massachusetts Mutual Life Insurance Company pays certain amounts above what your employer pays, and has full responsibility for claim funding upon termination of the group policy. The plan's benefits are described, including any limitations or exclusions that may affect your right to benefits. The procedure to claim plan benefits is also discussed.

**Plan Sponsor and Plan Administrator**
 Woods Petroleum Corporation
 3817 Northwest Expressway
 Suite 700
 Oklahoma City, OK
The plan provides medical and dental expense benefits. Should you have any question about the plan, contact the plan administrator's office. They will explain the benefit plan to you and help you present any claim for benefits.

**The Insurer**
The plan benefits are provided through a group insurance policy. That

21

> policy was issued to the plan sponsor by Massachusetts Mutual Life
> Insurance Company, called the "insurer" in this summary. Though the plan
> is intended to continue, it can be changed or terminated without the consent
> of the plan members. Your insurance policy rights, in such an event, are
> shown in this summary. If you wish to review the complete policy, please
> see the plan sponsor.

App. at 274.[6]

Although defendants contend this language clearly provided them with the right to alter or terminate plaintiffs' benefits at any time, we disagree. We note that the only reference to changing or terminating the plan is contained under the heading "The Insurer," which refers exclusively to Massachusetts Mutual. In our view, this language and its placement were simply intended to emphasize that Massachusetts Mutual retained the right to terminate or modify the group policy purchased by Woods for its employees. Had the parties intended for Woods, the plan sponsor, to be able to modify or terminate the plan, we believe the SPD should have said so under the heading "Plan Sponsor and Plan Administrator" (or somewhere other than under the heading "The Insurer").[7]

Given the ambiguities in the clause cited by defendants, we turn to extrinsic evidence of the parties' intent to create vested insurance benefits. For many of the reasons

---

[6] The district court accurately described the language of the SPD as "muddy and baffling." App. at 1295.

[7] In other cases, the SPD's at issue have more clearly provided the employer/plan sponsor the right to amend or terminate. See, e.g., Sprague v. General Motors Corp., 133 F.3d 388, 401 (6th Cir.) (en banc) (stating SPD specifically provided that General Motors, the employer/plan sponsor, "reserve[d] the right to amend, change or terminate the Plans and Programs described in this booklet"), cert. denied, 524 U.S. 923 (1998).

already discussed, we conclude the terms of the October 3 letters demonstrate an intent on the part of defendants to provide plaintiffs with vested insurance benefits. In particular, the letters unequivocally indicated persons taking advantage of the early retirement plan would be provided with health insurance for their lifetimes, at company expense. Although the letters indicated they were for "informational purposes only," nowhere was there a reference to the SPD, nor was there any other indication that the benefits described in the letters could be unilaterally altered by the company at a later date. We conclude the conduct of the parties also demonstrates an intent to create vested insurance benefits. For example, in July 1986, defendants altered the terms of its plan for existing employees, requiring employees to pay $20 per month for dependent health insurance coverage. Notwithstanding the change to the existing plan, defendants made no attempt to alter the new plan and continued to provide plaintiffs with dependent coverage at company expense. Indeed, for nearly ten years, defendants provided plaintiffs and their spouses with health insurance coverage at company expense. Finally, when defendants attempted to alter the plan in 1995, they did not purport to rely on the above-cited clause in the SPD, or on any other supposed right under ERISA to unilaterally modify the new plan. Instead, defendants relied on a section of the merger agreement between Woods and Sunshine, pursuant to which Sunshine agreed not to terminate or modify, for a period of ten years, any existing Woods' employee welfare benefit plans.

In conclusion, we agree with the district court that defendants intended, at the time

they offered early retirement to plaintiffs, to create vested rights to lifetime health insurance coverage.

*Fee award*

Although defendants have also challenged the district court's award of fees in favor of plaintiffs, they argue only that the fee award should be reversed in the event the underlying judgment in favor of plaintiffs is reversed. Because we find no merit to defendants' appeal, we likewise reject their attack on the fee award.

### *Plaintiffs' cross-appeals*

*Extent of coverage under new plan*

Plaintiffs contend the district court erred in determining the relief to which they were entitled under the new plan. In particular, plaintiffs contend the district court erred in failing to order defendants to provide them with the same level and type of health insurance benefits promised them at the time of their retirement (plaintiffs claim defendants are now attempting to provide them with the cheapest health insurance they can purchase). Plaintiffs also contend "[i]t is manifest from the language of the October 1985 letters that dental coverage and life insurance coverage would be provided for the lifetimes of the Rule of 70 Plan participants," and "[t]here is no basis in the record to support the district court's refusal to reinstate these coverages along with the medical insurance coverage." Pls.' Opening Br., at 37.

24

"A court must review [a] decision denying benefits under an ERISA plan de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Capital Cities, 141 F.3d at 1408 (quoting Firestone, 489 U.S. at 115). Because the documents relating to the new plan do not confer discretionary authority on defendants to determine entitlement to benefits, the district court properly applied a de novo standard in interpreting the plan. See id. In turn, we apply a de novo standard of review to "[q]uestions of law, such as a court's interpretation of an ERISA plan when the plan's terms are clear and there is no grant of interpretive authority to a plan administrator – or even the preliminary determination whether an ERISA's plan language is silent or ambiguous . . . ." Sunbeam-Oster Co. Group Benefits Plan v. Whitehurst, 102 F.3d 1368, 1373 (5th Cir. 1996). Any factual findings made by the district court, "such as the intent of the parties regarding an ERISA plan, are reviewed for clear error." Id.

Turning first to the dental and life insurance coverage, the October 3 letters provided plaintiffs would be "allowed to continue participation in the Group Dental Plan at company expense," and "would also be covered for $10,000 life insurance on [themselves] and $5,000 on [their] spouse[s] with Security Connecticut, with the premiums for these coverages also paid by the Company." App. at 116. Nothing in this language suggests an intent on the part of defendants to create vested rights in dental and life insurance coverage. We conclude the district court did not err in refusing to grant

25

relief to plaintiffs on their claims for dental and life insurance coverage.

The more difficult issue is what type of health insurance coverage was contemplated by the new plan. The October 3 letters provided:

> [T]he Plan provides that you and your eligible dependents would be entitled to receive health care under [Woods'] current group hospitalization plan with Massachusetts Mutual, fully paid for at Woods Petroleum Corporation's expense until the time of your death. At that time, the hospitalization insurance would continue in full force for one year from the anniversary date of the retiree's death for the retiree's spouse at no cost to your spouse. However, within the year period from the date of the retiree's death, should the spouse remarry, all coverage would cease immediately. After the year passes, the spouse may elect to convert to a private plan with Massachusetts Mutual with the cost being borne 100% by the spouse. During your lifetime, you would simply submit your claims for reimbursement to the Company (via the Personnel Department) as you do now. Once converted to a private plan, your premiums and claims would be handled direct with the insurance carrier instead of Woods Petroleum Corporation.
>
> * * *
>
> Something that you do need to keep in mind, once you become age 65, you would need to submit your claims first to Medicare, as it would then become the primary carrier. You would then submit any amounts not paid by Medicare to Massachusetts Mutual as the secondary carrier. (Be sure that you apply for Medicare upon turning age 65.)

App. at 116-17. The district court implicitly concluded the letters were ambiguous regarding the extent of health insurance coverage to be provided to plaintiffs. It then found, after presumably reviewing the extrinsic evidence, that the parties did not intend a particular type or level of coverage.

After carefully examining the appellate record, we conclude the district court erred in finding that the parties intended nothing with respect to the extent or type of health

26

insurance coverage to be afforded plaintiffs under the Rule of 70 plan.  The October 3

letters specifically indicated that plaintiffs would be provided the same health insurance

benefits as Woods' current employees.  Further, the extrinsic evidence presented by the

parties clearly and unequivocally indicated that, for a period of approximately ten years

following implementation of the Rule of 70 plan, Sunshine afforded plaintiffs a level of

health insurance coverage consistent with that provided to Sunshine's current employees.

Thus, both the language of the October 3 letters and the parties' conduct flies directly in

the face of the district court's finding.  Even assuming, *arguendo*, the evidence was

equivocal regarding the parties' intent on this point, we believe the ambiguity should have

been construed in favor of plaintiffs.  See, e.g., Morton v. Smith, 91 F.3d 867, 871 n.1 (7th

Cir. 1996) ("The federal common law of ERISA . . . provide[s] that ambiguous terms in

benefit plans should be construed in favor of beneficiaries" where there is "an absence of

conclusive evidence about intent.").

We conclude plaintiffs are entitled to the same type of coverage, at defendants'

expense, as provided to defendants' current salaried employees.[8]  If defendants were to

change coverage for their current employers, such changes would also affect plaintiffs.

Defendants could not, however, place plaintiffs in a low-cost insurance plan while

---

[8] The record suggests this is how the parties have effectively interpreted the plan since its inception.  In particular, the record indicates that at some point after 1985, defendants changed insurers from Massachusetts Mutual to Blue Shield of Idaho, but continued to provide plaintiffs with the same coverage as provided to defendants' employees.

simultaneously providing a higher level of service and benefits to their current employees.

Given our interpretation of the new plan, it is necessary to reverse the district court's judgment on this point and remand the case to the district court for entry of judgment consistent with this opinion.

*District court's refusal to impose penalties on defendants*

In ruling on the parties' cross-motions for summary judgment, the district court concluded defendants violated § 1024(b)(4) of ERISA and were subject to penalties for failing to provide plaintiffs Wood and Deboard, upon request, with copies of the 1985 merger agreement between Woods and Sunshine (which defendants had originally relied on to justify their decision to discontinue paying plaintiffs' insurance premiums). App. at 669-70. However, the district court ordered that the "[a]mount of penalty, if any, is left to trial." Id. at 670. At trial, plaintiffs introduced an exhibit (Exhibit 54) outlining the maximum penalties allowable under 29 U.S.C. § 1132(c) for the violation found by the district court, as well as other similar violations not cited by the district court. Supp. App. at 264-66. According to that exhibit, the district court had authority to award $4,643,200 in penalties. Id. at 266. At the conclusion of the bench trial, the district court decided not to impose any penalties on defendants for their violation of ERISA's document disclosure requirements. In support of its decision, the district court concluded (1) plaintiffs' calculation of entitlement to penalties was "padded," "absolutely preposterous," and not

28

filed in good faith; (2) plaintiffs filed this case shortly after requesting the merger agreement, had access to discovery under the Federal Rules of Civil Procedure, and could have obtained the agreement that way; (3) "there was no sinister intent behind" defendants' response, "nor any credible showing . . . of any cover-up about the company's reasons for taking the action[s]" at issue; and (4) any purpose to be served by invoking the disclosure rules was subsumed in the disposition of this case. Id. at 1299-1301.

Plaintiffs challenge the district court's refusal to grant any monetary penalties. In particular, plaintiffs contend the district court erred in relying on the absence of prejudice to plaintiffs, and the lack of bad faith on the part of defendants in failing to provide the requested documents. Plaintiffs further argue that even if those factors were relevant, the evidence demonstrates both that they were prejudiced by defendants' failure to produce the requested merger agreement, and that defendants' failure was a product of bad faith. As for Exhibit 54, plaintiffs contend it was not "padded," but was an outline of the maximum penalties the district court had authority to impose. Finally, plaintiffs argue the district court misunderstood the legislative purposes of § 1132(c), i.e., "to avoid rather than promote litigation and its attendant discovery battles." Pls.' Opening Br., at 42.

A district court's assessment of, or refusal to assess, penalties under 29 U.S.C. § 1132(c) is reviewed for an abuse of discretion. See 29 U.S.C. § 1132(c)(1)(B) (specifically emphasizing that district court, "in its discretion," may order statutory penalties); Wilcott v. Matlack, Inc., 64 F.3d 1458, 1461 (10th Cir. 1995). Under this

29

standard, we will reverse only if we have a definite and firm conviction that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. Moothart v. Bell, 21 F.3d 1499, 1504 (10th Cir. 1994).

Reviewing the record on appeal, we conclude the district court did not abuse its discretion in choosing not to impose penalties on defendants. Although plaintiffs are correct that neither prejudice nor bad faith is required for a district court to impose penalties under 29 U.S.C. § 1132(c), the presence or absence of these factors can certainly be taken into account by a district court in deciding whether to exercise its discretion and impose a penalty. See Moothart, 21 F.3d at 1506. Thus, the district court did not err in relying on these factors. Moreover, the district court's findings concerning prejudice and bad faith are not clearly erroneous. As for the district court's characterization of Exhibit 54, there is support in the record for the district court's conclusion. As noted, the district court concluded defendants failed to provide a single document (the merger agreement), yet Exhibit 54 referred to numerous other documents that defendants allegedly failed to produce. Finally, we find no merit to plaintiffs' assertion that the district court failed to appreciate the purpose of penalties under § 1132(c).

*Amount of fee award*

Plaintiffs contend the district court erred in establishing the amount of the fee award. More specifically, plaintiffs contend they should have been allowed to recover fees

reasonably expended in pursuit of all their claims, not just the claims on which they prevailed at trial.

Under ERISA, a district court "in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). In deciding whether to exercise its discretion and award fees, a district court should consider the following nonexclusive list of factors: (1) the degree of the offending party's culpability or bad faith; (2) the degree of the ability of the offending party to satisfy an award of attorney fees; (3) whether or not an award of attorney fees against the offending party would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions. Pratt v. Petroleum Prod. Management Inc. Employee Sav. Plan & Trust, 920 F.2d 651, 664 (10th Cir. 1990). We review a district court's fee decision for an abuse of discretion. Thorpe v. Retirement Plan of the Pillsbury Co., 80 F.3d 439, 445 (10th Cir. 1996).

In support of their motion for fees and costs, plaintiffs submitted an affidavit from counsel requesting $158,145.75 in fees. App. at 778. The district court granted plaintiffs' motion in part, concluding "plaintiffs should be awarded a reasonable attorney's fee for their success in gaining reinstatement of health insurance benefits for participants and beneficiaries of the Rule of 70 Plan." Id. at 895. The district court agreed with defendants, however, that it "should exclude time spent by plaintiffs' counsel on patently meritless issues." Id. at 897. In particular, the district court concluded plaintiffs should

31

not recover fees for their "quest for a lump-sum payment characterized as 'restitutionary recovery of future benefits' [which] was obviously without merit," or their "quest for an assessment of exorbitant penalties under 29 U.S.C. § 1132(c)(1)." Id. The district court further concluded the amount sought by plaintiffs was unreasonable because they (1) chose to employ four attorneys, even though the case did not warrant that many attorneys, and (2) sought fees for time spent by their attorneys conferring about the case. Id. at 898-99. Accordingly, the district court directed plaintiffs to "submit an amended affidavit of counsel . . . containing an itemization of attorney's fees for which defendants may reasonably be charged consistent with this order." Id. at 899. Plaintiffs complied with the district court's order and submitted an amended affidavit of counsel requesting $127,727.75 in fees. Id. at 901. After reviewing the amended affidavit, the district court concluded plaintiffs' request was still "excessive," was not in complete compliance with the prior order, and needed to be reduced. The district court concluded "a percentage reduction [wa]s the best way to reach a reasonable sum," id., and reduced their fee request by 25%, resulting in a total fee award of $95,795.44. Id. at 902.

We find no abuse of discretion on the part of the district court in determining plaintiffs' fee award. The district court carefully considered and weighed each of the five relevant factors. In particular, it considered the relative merits of the parties' positions on each claim asserted by plaintiffs and chose to deny fees to plaintiffs for time expended on two claims. Although different judges might have chosen to grant fees to plaintiffs for

their failure to report claim, we find no abuse of discretion on the part of the district court in choosing otherwise. Indeed, the district court's reasons for choosing not to grant fees on that claim strike us as entirely reasonable:

> Plaintiffs' quest for an assessment of exorbitant penalties under 29 U.S.C. § 1132(c)(1) was . . . lacking in merit. The Court ruled as a matter of law before trial that a particular document should have been furnished to certain plaintiffs, and reserved for later decision the issue of what penalty (if any) should be assessed on account of defendants' nonproduction. Plaintiffs chose that opportunity to generate a laundry list of materials that could have been encompassed by their request for documents and an elaborate calculation of fines applicable to those documents. By the time of trial, plaintiffs' calculation exceeded three million dollars. This was ridiculous. A presentation to the Court concerning the penalty issues to be decided at trial could easily have been prepared by a knowledgeable ERISA attorney within two hours' time.

App. at 897-98.

Having said this, we nevertheless conclude it is necessary to reverse and remand the fee award in light of our decision regarding the extent of health care coverage to which plaintiffs are entitled under the Rule of 70 plan. Because our decision in this regard alters the amount of benefits conferred on plan members, and likewise alters the relative merits of the parties' positions, we conclude the district court should reevaluate the amount of fees to which plaintiffs are entitled and determine whether an increased award is appropriate.

*Denial of motion to enforce judgment*

On October 1, 1997 (after the entry of final judgment and the filing of notices of

33

appeal), defendants issued a memorandum to plaintiffs indicating there would be a change in health insurance coverage for those plaintiffs over the age of 65. Supp. App. at 151. More specifically, the memorandum indicated plaintiffs over the age of 65 would be provided with health insurance coverage, at defendants' expense, "by BlueLincs HMO, a subsidiary of Blue Cross and Blue Shield of Oklahoma, through a program called 'BlueLincs Senior.'" Id.

Plaintiffs responded to the proposed change in coverage by filing a motion to enforce judgment.[9] Supp. App. at 118. Plaintiffs asked the district court "to direct the . . . defendants to cease and desist from this threatened action to eliminate their supplemental health benefits and to continue to provide medical benefits to the Medicare-eligible plaintiffs consistent with those provided to other Rule of 70 Plan participants and required by the outstanding order" of the court. Id. at 124. On December 4, 1997, the district court denied plaintiffs' motion, apparently treating the motion as a motion for clarification of judgment under Fed. R. Civ. P. 60(a). The court noted it had "previously found that the

_____

[9] According to plaintiffs, this change in coverage meant changing from the previous fee-for-service plan, in which plaintiffs could visit any doctor of their choice, to an HMO plan, under which plaintiffs would have to seek and receive prior approval before visiting a particular doctor. Plaintiffs also contend the BlueLincs program "is offered to any Medicare-eligible individual free of charge," and thus costs defendants little or nothing to provide. In short, plaintiffs contend the BlueLincs program is "merely a free substitute for Medicare made available to persons who are willing to surrender control over the selection of the type and manner of the health care they receive in return for such course of medical treatment as may be determined by the HMO." Pls.' Opening Br. at 31.

34

Rule of 70 Plan did not promise lifetime medical benefits at a particular level of coverage," or "of a particular type." Id. at 233. The district court further concluded the change in coverage proposed by defendants "neither shift[ed] any cost to plaintiffs nor terminate[d] medical insurance coverage; it merely alter[ed] the manner in which health care services w[ould] be provided to Medicare/HMO-enrollee plaintiffs." Id. Although the district court acknowledged plaintiffs' motion arose "from a lack of clarity in the Court's prior findings," more specifically "imprecise language in the judgment," it emphasized plaintiffs' counsel had prepared the judgment. Id. at 234.

On appeal, plaintiffs contend the district court erred in failing to grant their motion. As with their separate attack on the underlying judgment, plaintiffs contend that under the language of the October 3 letters they are entitled to the same type and level of coverage provided to them at the time of their retirement. We find it unnecessary to address these arguments, however, in light of our decision regarding the extent of health care coverage to which plaintiffs are entitled under the Rule of 70 plan.[10]

III.

Plaintiffs' motion to dismiss is DENIED. As regards defendants' appeal, we

---

[10] We note that the district court must nevertheless determine, on remand, whether the BlueLincs coverage is consistent with our interpretation of the plan. In other words, the district court must determine whether the BlueLincs program provides plaintiffs with the same type of coverage that defendants' current employees receive. If the answer to that question is "no," then defendants may not, consistent with the terms of the plan, purport to provide plaintiffs with health insurance coverage under the BlueLincs program.

AFFIRM.  As regards plaintiffs' cross-appeals, we AFFIRM in all respects except for (1) the health insurance coverage issue, which we REVERSE and REMAND for entry of judgment consistent with this opinion, and (2) the fee award, which we REVERSE and REMAND to the district court for further consideration.